UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES RUTHERFORD, and THE ASSOCIATION 4 EQUAL ACCESS,<br><br>                                        Plaintiffs,<br><br>v.<br><br>EVANS HOTELS, LLC; and DOES 1 to 50,<br><br>                                        Defendants. | Case No.:  18-CV-435 JLS (MSB)<br><br>**ORDER: (1) DISMISSING PLAINTIFF'S SECOND CAUSE OF ACTION FOR VIOLATION OF THE AMERICANS WITH DISABILITIES ACT FOR LACK OF ARTICLE III STANDING; (2) DECLINING SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS' FIRST CAUSE OF ACTION FOR VIOLATION OF THE CALIFORNIA UNRUH CIVIL RIGHTS ACT; (3) DENYING AS MOOT ALL PENDING MOTIONS; AND (4) REMANDING ACTION TO THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF SAN DIEGO**<br><br>(ECF Nos. 21, 45, 59, 60, 73) |

Presently before the Court are the Motions for Class Certification (ECF No. 45) and *in Limine* to Exclude Evidence Disputing Admitted Facts (ECF No. 73) filed by Plaintiffs James Rutherford and The Association 4 Equal Access (the "Association"), as well as Defendant Evans Hotels, LLC's *Ex Parte* Motion to File a Supplemental Brief re

Opposition to Class Action and Reopen Class Discovery If Necessary (ECF No. 60) (all together, the "Pending Motions").  On April 29, 2019, the Court ordered Plaintiffs to show cause why this action should not be dismissed for lack of Article III standing over Plaintiffs' claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), *see* ECF No. 59 at 10–13, and the Court held an evidentiary hearing as to Plaintiffs' standing on July 1, 2019.  *See* ECF Nos. 66, 74, 78.  Having carefully reviewed the Parties' arguments, the record, and the relevant law, the Court (1) **DISMISSES** Plaintiffs' second cause of action for violation of the ADA for lack of standing; (2) **DECLINES** to exercise supplemental jurisdiction over Plaintiff's first cause of action for violation of the California Unruh Civil Rights Act, California Civil Code §§ 51 *et seq.* ("Unruh Act"); (3) **DENIES AS MOOT** the Pending Motions; and (4) **REMANDS** this action to the Superior Court of the State of California, County of San Diego.

**BACKGROUND**

## I.   Procedural Background

On January 18, 2018, Mr. Rutherford and the Association filed a complaint against Defendant for violation of the Unruh Act and for declaratory relief for violations of Title III of the ADA and the Unruh Act in the Superior Court of the State of California, County of San Diego, claiming that Defendant's hotel reservation system denied Plaintiffs and those similarly situated full and equal access to its reservation services.  *See generally* ECF No. 1-2 Ex. A.  Plaintiffs filed an amended complaint on February 16, 2018.  *See generally* ECF No. 1-2 Ex. B.

On February 26, 2018, Defendant removed to this Court on the basis of federal question jurisdiction.  *See generally* ECF No. 1.  Plaintiffs requested leave to file a second amended complaint to add class action allegations, *see generally* ECF No. 12, which the Court granted.  *See generally* ECF No. 20.  Plaintiffs' operative Second Amended Complaint ("SAC") is a putative class action asserting two causes of action for violations of the Unruh Act and the ADA.  *See generally* ECF No. 21.

/ / /

2

On August 30, 2018, Plaintiffs moved to strike several of Defendant's affirmative defenses, *see* ECF No. 26, and Plaintiffs moved to certify several nationwide and California classes on January 10, 2019.  *See* ECF No. 45.  On April 29, 2019, the Court granted in part and denied in part Plaintiff's motion to strike and ordered Plaintiffs to show cause why this action should not be dismissed for lack of Article III standing and subject-matter jurisdiction.  *See* ECF No. 59.  In particular, the Court noted that "it would appear that Plaintiffs cannot establish an intent to return or deterrence and therefore lack standing to assert their ADA claims."  *Id.* at 11.  The Court ordered Plaintiffs to file a response to the Order to Show Cause ("OSC") within fourteen days.  *Id.* at 12–13.

Before Plaintiffs' deadline, Defendant filed an *ex parte* motion, apprising the Court that the Riverside County District Attorney's Office had filed a civil law enforcement action (the "Enforcement Action") against Plaintiffs and their counsel of record in this action for violating California's Unfair Competition Law, California Civil Code §§ 17200 *et seq.* ("UCL"), by filing fraudulent ADA lawsuits.  *See generally* ECF No. 60; *see also* Declaration of Nadia P. Bermudez in Support of *Ex Parte* Motion ("Bermudez *Ex Parte* Decl.," ECF No. 60-1) Ex. A.  The Enforcement Action complaint alleged that, "[a]s of the date of th[e Enforcement Action] Complaint, Defendants have filed some 300 ADA lawsuits in federal court (namely, the Central District of California and the Southern District of California)," as well as "an additional 22 lawsuits, based on alleged violations of the Unruh . . . Act . . . in the Riverside County Superior Court."  Bermudez Decl. Ex. A ¶ 18.  The Enforcement Action complaint further alleged that Plaintiffs' "federal ADA lawsuits . . . rely on a few core misrepresentations," *id.* ¶ 21, including that Mr. "Rutherford had no good faith intention to return to any of the businesses sued in Defendants' federal ADA lawsuits[] and[,] in fact[,] did not return to any of the businesses sued in Defendants' federal ADA lawsuits after filing said lawsuits," *id.* ¶ 25, and, consequently, Mr. "Rutherford lacked standing to file and maintain each and every one of Defendants' federal ADA lawsuits, and Defendants were aware of this lack of standing at the time each and every one of their federal ADA lawsuits were filed and settled."  *Id.* ¶ 26.  Specifically,

the Enforcement Action alleged that Mr. Rutherford had no intention to return to any of the businesses sued in the federal ADA lawsuits because they "involve numerous businesses located in excess of 50 miles from Rutherford's home, in areas such as Moreno Valley, Hemet, Perris, Riverside, Corona, Temecula and Murrieta" and that Mr. "Rutherford had no legitimate purpose for being in those areas, other than to scout and surveil future targets for Defendants' ADA lawsuit scheme." *Id.* ¶ 42. As a result of the alleged violations, the Riverside County District Attorney's Office sought a permanent injunction, *id.* Prayer ¶ 1, and requested "a civil penalty of no less than one million dollars ($1,000,000) be imposed against each of the Defendants," *id.* Prayer ¶ 2, and restitution to the defendants in the ADA lawsuits. *Id.* Prayer ¶ 3.

Plaintiffs filed their response to the Court's OSC on May 13, 2019, *see* ECF No. 62 ("Pls.' Resp."), and Defendant filed its response on May 20, 2019. *See* ECF No. 63 ("Def.'s Resp."). After reviewing the Parties' submissions, the Court determined that an evidentiary hearing was required because "deciding the issue of standing would require the Court to resolve issues of credibility and/or disputed material facts." *See* ECF No. 66 at 1–2. The Court therefore set an evidentiary hearing for July 1, 2019. *See id.* at 2. On June 20, 2019, the Parties filed their joint witness and exhibit lists, *see* ECF No. 67, and their evidentiary hearing briefs. *See* ECF Nos. 68 ("Def.'s Tr. Br."), 69 ("Pls.' Tr. Br.").

On June 28, 2019, Plaintiffs filed an opposition to Defendant's *ex parte* motion, *see* ECF No. 71, informing the Court that a demurrer had been filed in the Enforcement Action. *See* ECF No. 71-2. On the same date, Defendant file a request for judiciary notice in anticipation of the evidentiary hearing. *See* ECF No. 72 ("Def.'s RJN").

The evidentiary hearing was held between 9:00 a.m. and 3:40 p.m. on July 1, 2019. *See generally* ECF Nos. 74, 78 ("Tr."). Both Mr. Rutherford and his fiancée, Patricia Filardi, who is named as a "Claimant" in the Second Amended Complaint, *see* SAC ¶ 16, testified, *see* ECF No. 75; *see also generally* Tr., and several exhibits were admitted into evidence. *See* ECF No. 76; *see also generally* Tr.

/ / /

4

To respond to particular inquiries arising during the evidentiary hearing, Plaintiffs filed a supplemental post-hearing brief on August 5, 2019.  *See* ECF No. 80 ("Pls.' Supp. Br.").  Plaintiffs also filed a supplemental opposition to Defendant's *ex parte* motion on August 6, 2019, *see* ECF No. 81, to let the Court know that the demurrer in the Enforcement Action had been sustained without leave to amend in July 2019.  *See* ECF Nos. 81-3–4.

Defendant filed its closing statement on August 19, 2019.  *See* ECF No. 84 ("Def.'s Closing Br."), and Plaintiffs filed their closing statement on August 26, 2019.  *See* ECF No. 86 ("Pl.'s Closing Br.").  On January 10, 2020, Defendant filed a reply in support of its *ex parte* motion, *see* ECF No. 94, informing the Court that the County of Riverside's District Attorney's Office had filed an appeal of the dismissal of the Enforcement Action on September 17, 2019.  *See* ECF No. 94-1 Exs. B, C.

## II.   Allegations and Evidence

### A.   *Mr. Rutherford and His Impairments*

Mr. Rutherford was born on January 19, 1952.  *See* Def.'s Ex. 200 ("Rutherford Depo.") at 20:7–8.  Mr. Rutherford resides at 25 Chandra Lane in Rancho Mirage, California. Tr. at 82:4–7. Mr. Rutherford last worked as a personal assistant for Ms. Filardi when they lived in Illinois.  *See* Rutherford Depo. at 116:8–25.  They moved to California for Ms. Filardi's health approximately five years before the evidentiary hearing.  *See* Tr. at 129:8–10.  Mr. Rutherford is not currently employed, *see id.* at 56:1–3, although he does receive Social Security.  *See* Rutherford Depo. at 42:4–15.

Mr. Rutherford experiences "several physical impairments."  Tr. at 8:17–18.  His "main problem," diagnosed in 2013, *see id.* at 9:5–6, is spinal stenosis, which has been aggravated by a herniated disc.  *Id.* at 8:18–21.  Although the condition is prone to flares, it causes Mr. Rutherford varying degrees of pain.  *Id.* at 8:21–9:1.  For example, the condition can be a little worse in a humid climate than when Mr. Rutherford is in a drier climate.  *See id.* at 9:1–5.

Although Mr. Rutherford received physical therapy in Illinois beginning in 2013, it did not help his condition.  *See id.* at 9:6–15.  Mr. Rutherford also has tried several other

therapies. *See id.* at 9:16–10:3. He "maintain[s] a level of being able to . . . get around through [his] day with . . . a lot of ibuprofen, a lot of Advil," *id.* at 9:24–10:1, and takes baclofen and Flexeril for muscle spasms. *Id.* at 9:19–21. He has also taken gabapentin, a nerve-blocker. *Id.* at 9:21–23. In 2014, Mr. Rutherford had two epidural steroid injections, which "helped [him] a great deal." *Id.* at 12:7–13:1. In 2018 and 2019, Mr. Rutherford also had two spinal ablations, during which a medication was injected into specific spinal nerves, providing temporary pain relief. *See id.* at 13:5–14:25.

The pain Mr. Rutherford experiences as a result of his spinal stenosis has affected Mr. Rutherford's mobility, particularly his ability to walk long distances. *See id.* at 17:12–21. As a result, Mr. Rutherford sometimes uses a rollator or a walker,[1] *see id.* at 17:24–18:13, 27:17–28:5; a cane, *see id.* at 18:14–25; or very occasionally a wheelchair, *see id.* at 19:25–20:3, to assist with mobility, although there are periods during which he can walk unassisted. *See id.* at 21:7–8. Mr. Rutherford uses his wheelchair only when his stenosis is "unbearably painful," *see id.* at 20:4–11, and last used a wheelchair approximately a year before the evidentiary hearing. *See id.* at 20:14–16. Mr. Rutherford also has difficulty standing and bending over. *See id.* at 17:21–23. Because of these mobility issues, Mr. Rutherford has a handicapped parking placard issued by an Illinois agency. *See* Rutherford Depo. at 31:2–32:11.

In addition to the spinal stenosis, Mr. Rutherford also has difficulty balancing because of fractured heels, *see* Tr. at 18:24–19:24, and arthritis in his hands that can make it difficult to turn certain types of doorknobs. *See id.* at 25:8–14. Mr. Rutherford also has a "spotty memory," *id.* at 59:6–10, and "once . . . came to th[e] conclusion" that he has some short- and long-term memory loss. *See id.* at 59:11–61:9. During his deposition, Mr. Rutherford testified that this was the result of being anesthetized "over and over again all in the course of one week . . . a couple years ago." Rutherford Depo. at 9:9–17; *see also*

---

[1] Unlike the walker, the rollator has a seat. *See* Tr. at 27:19. Consequently, Mr. Rutherford prefers the rollator and "do[es]n't use the walker that much." *See id.* at 27:18–19.

*id.* at 17:9–21.  No doctor, however, has ever diagnosed Mr. Rutherford with memory loss. *See id.* at 18:4–6.

Mr. Rutherford claimed during his deposition, for example, that he could not remember the house number affiliated with his present address, *see id.* at 22:10–23:17, despite being able to provide the address for his prior residences in Chicago, *see id.* at 26:25:22–26:1, 27:7–18, and that he did not know who owned his residences in either Rancho Mirage, California, *see id.* at 24:1–24, 129:3–15, or Chicago, Illinois.  *See id.* at 25:22–26:14.

## B.    *Ms. Filardi and Her Impairments*

Ms. Filardi, a "claimant" to this action,[2] *see* SAC ¶ 16, is Mr. Rutherford's fiancée. Tr. at 44:14–15.  Ms. Filardi and Mr. Rutherford live together in Rancho Mirage, California, *see id.* at 129:11–13, where Mr. Rutherford serves as her caretaker and attends to many of her physical needs.  *Id.* at 45:12–18.  For example, because Ms. Filardi is unable to drive herself, Mr. Rutherford often drives her.  *See id.* at 45:19–22.  Like Mr. Rutherford, Ms. Filardi is not currently employed.  *See id.* at 132:15–17.

Ms. Filardi has been a paraplegic for thirty years, *id.* at 139:7, and is wheelchair bound, meaning that she is unable to stand.  *Id.* at 44:22–24.  Because Ms. Filardi cannot use her fingers, she requires fully accessible handles on door, furniture, and appliances.  *Id.* at 45:1–4.

## C.    *The Association*

The Association is an unincorporated, grassroots association, Tr. at 50:12–14, 50:18, that has "a very informal educational program."  *Id.* at 50:15–18.  Mr. Rutherford founded the Association sometime between 2006 and 2008,[3] *see* Rutherford Depo. at 180:22–24;

---

[2] Despite Ms. Filardi's status as a "claimant," rather than as a plaintiff, to this action, the Court accepted her testimony at the evidentiary hearing over Defendant's objection.  *See* Tr. at 120:22–121:12, 147:9–14.

[3] Although the Association's website indicates that it has been "[p]romoting equal access since 1999," *see* Ass'n Depo. at 63:9–21, Mr. Rutherford believes that he founded the Association in "2006, tops."  *See id.*

Def.'s Ex. 202 ("Ass'n Depo.") at 19:7–9, 22:7–13, and considers himself its director, *see* Rutherford Depo. at 189:11–190:1, although the Association has no official board of governance, Tr. at 49:2–4; Ass'n Depo. at 30:3–11; policies or procedures, *see* Ass'n Depo. at 77:19–23; or bylaws. *See id.* at 77:24–78:4. The Association has a federal employer identification number, *see* Ass'n Depo. at 13:9–14:16, although the Association has never had any employees. *See id.* at 14:17–19.

"From time to time, [Mr. Rutherford] will speak with other people who are disabled and try to assist them in any way that [he] can with regards to the needs that they have regarding their disability, specifically with regards to their accessibility rights." Tr. at 50:18–51:1. Mr. Rutherford does not "keep a log of who [he has] spoke[n] to, [or] when [he has] spoke[n] to them," *id.* at 51:6–7, and he could not recall anyone with whom he had spoken "recently" as of his testimony on July 1, 2019. *See id.* at 51:8–10. The Association does not hold regular meetings. *See* Ass'n Depo. at 29:23–25.

Mr. Rutherford and Ms. Filardi are the Association's only active members in California, Tr. at 49:10–12, although "[t]here are a couple of people in Chicago that [Mr. Rutherford] speak[s] with from time to time," including Jerry Vasilatos, Fernando Aguilar, Margaret Wilson, Tye Shelton, and "a couple others," *id.* at 49:5–9, 49:13–50:2, who have not had any involvement in the Association for more than three years.[4] *Id.* at 50:5–9. Nonetheless, Mr. Rutherford testified at the Association's deposition that it currently had more than five members. *See* Ass'n Depo. at 23:11–17.

Mr. Rutherford is "essentially responsible for" the Association, Tr. at 48:19–21, including its website. *Id.* at 50:10–11. Although Mr. Rutherford started and created the

---

at 22:7–13. Despite being solely responsible for the content on the Association's website, *see id.* at 51:24–52:6, 60:13–16, Mr. Rutherford did not know where the claim on the website that the Association was founded in 1999 came from. *See id.* at 63:18–21.

[4] Indeed, at the Association's October 19, 2018 deposition, Mr. Rutherford testified that he had not spoken with the only other members he could name at that time—Mr. Aguilar and Ms. Shelton—for between five and ten years. *See* Ass'n Depo. at 24:2–27:21.

Association's website, A4EA.com, *see* Rutherford Depo. at 21:1–2; Ass'n Depo. at 52:2–6, he did not know who registered it, *see* Rutherford Depo. at 20:20–23, and was not familiar with James Robinson, who registered the domain name. *See id.* at 21:3–13.

Although Ms. Filardi accompanied Mr. Rutherford to open the Association's checking account with Chase Bank, *see* Tr. at 53:18–23, Mr. Rutherford appears to be the sole signatory to the account, *see id.* at 48:24–49:1, although it is possible that Ms. Filardi may also be a signatory. *See id.* at 53:14–17, 53:24–54:2. Mr. Rutherford receives online statements for the Association's account, although when he does review them, he "do[es]n't look at them very closely." *See id.* at 54:8–55:3. Consequently, Mr. Rutherford is not sure of the precise amount of funds in the Association's account, although he believes that it is around $80,000. *See id.* at 55:4–11. Mr. Rutherford has withdrawn as much as $20,000 from the Association's account "for personal reasons." *See id.* at 53:12–13; *see also* Rutherford Depo. at 184:20–185:7, 190:12–18.

The Association's role has evolved over the years, taking on a greater interest in litigation. *See* Ass'n Depo. at 27:25–28:12. Mr. Rutherford is the only person with the authority to bring a lawsuit on behalf of the Association, *see id.* at 58:7–22, or to settle such lawsuits. *See id.* at 64:21–65:1. Mr. Rutherford testified that he has filed at least more than twenty ADA lawsuits on behalf of the Association, Tr. at 52:7–15, with the first being in approximately 2010. *See* Ass'n Depo. at 22:14–21. At the Association's deposition, Mr. Rutherford thought that the Association was involved between ten and twenty pending cases, *see id.* at 87:2–19, although he could recall only the actions against Defendant and Pelican Hill Resort. *See id.* at 88:14–89:2.

As a result of these litigation efforts, Mr. Rutherford has collected settlements on behalf of the Association, Tr. at 51:22–52:6, 52:16–18, although he does not believe that the total funds collected have exceeded $50,000. *Id.* at 52:19–53:5. Mr. Rutherford commingles settlement funds received by the Association and himself into the Association's checking account. *See id.* at 55:12–25; Ass'n Depo. at 33:14–35:22. Mr. Rutherford estimated that he had deposited approximately $80,000 or $90,000 in

settlement proceeds in the two years preceding the Association's October 19, 2018 deposition.  Ass'n Depo. at 37:22–38:7.

Mr. Rutherford has no records of the lawsuits filed on behalf of the Association, *see* Ass'n Depo. at 84:8–11, and has not kept copies of any of the settlement agreements negotiated on its behalf.  *See id.* at 84:20–85:3.

### D.    Mr. Rutherford's Evaluation of Hotels

When determining whether to stay at a hotel, Mr. Rutherford assesses the "[t]he accessibility of the hotel in its entirety."  *See* Tr. at 21:22–22:19.  This includes accessible parking and an accessible path of travel.  *See id.* at 22:20–21.  As for accessible parking, Mr. Rutherford holds a Disabled Person's Parking Placard and, when he is driving Ms. Filardi, he requires access to van-accessible parking.  *See id.* at 23:6–20.  When Mr. Rutherford is using his rollator, it is "nice" to have access to van-accessible parking because it provides "more room."  *Id.* at 23:25–24:12.  Regarding path of travel, Mr. Rutherford takes into account any obstacles between the parking and the entrance to the hotel.  *See id.* at 24:13–19.  He also evaluates the entrance to the lobby and hotel room, including the door handle and width of the door.  *See id.* at 24:20–25:16.

As for hotel rooms, the "most important considerations" include grab bars in the bathroom.  *See id.* at 25:17–26:2.  Specifically, grab bars "behind the water closet and to the side of the wall which is nearest to the water closet" "help[ Mr. Rutherford] a real lot," *id.* at 26:3–7, and he "like[s] to have them in the shower, too," *id.* at 26:8–11, because they provide "something to grab onto," as well as the "psychological value to knowing that there's something there."  *Id.* at 26:16–22.  Mr. Rutherford also "really like[s] to have" a roll-in shower, if possible, *id.* at 26:12–13, because "[t]here's more room in there" and "grab bars . . . are required."  *Id.* at 26:25–27:7.  He also "really like[s]" to have a non-skid floor.  *Id.* at 28:12–17.  While roll-in showers are "a preference" for Mr. Rutherford, they are a necessity for Ms. Filardi.  *See id.* at 27:7–10.  It is also "nice" to have an accessible sink so that Mr. Rutherford can sit on his rollator while he brushes his teeth.  *See id.* at 27:12–22.

### E.   Ms. Filardi's Evaluation of Hotels

Ms. Filardi similarly testified that "there's more than one feature that's required for a room to be accessible." Tr. at 123:7–8.  Parking, for example, is "very, very important." *See id.* at 122:10.  "Problems with the parking" may include "no ramp; . . . no accessible parking to . . . maneuver[]; . . . [and] something obstructing the sidewalk that goes from the parking lot to the front desk." *Id.* at 123:14–18.  The front desk itself can also present problems, *see id.* at 122:10–11, because "sometimes . . . the[ person at the front desk] can't even hear you because the desk is so high, or they try to hand you paperwork or hand you the keys and you can't even, you know, reach them because the counter is so high." *Id.* at 123:18–23.

And of course, "if you can't stay at the room, there's no point in going to the hotel." *Id.* at 122:11–13.  For example, "if you go to the room and you can't even enter the room because there might be a lip that trips up your wheelchair, or the doorway is not wide enough, so you can't even enter the room." *Id.* at 123:23–124:1.  Light switches, the drapes, and the peep hole may be out of reach. *Id.* at 124:1–2, 124:5–8, 124:13–16.  For safety reasons, the ability to see who is at the door is also "really important" to Ms. Filardi. *Id.* at 124:15–16.

As for the restroom, grab bars are important, as is the height of the sink and mirror. *See id.* at 124:2–4.  With regard to the shower, even if it is advertised as a roll-in shower, *see id.* at 127:12–21, it may be difficult or impossible to get into the shower and, even then, the grab bars or shower handle may be out of reach. *See id.* at 124:8–12.

With large properties, transportation may also present an issue "because you need to know how to get from one place to another place in your wheelchair or using the hotel property." *Id.* at 122:6–9.

### F.   Mr. Rutherford's and Ms. Filardi's Experience with Other Hotels and Litigation

Within the last three years, Mr. Rutherford has spent the night at only a handful of hotels. *See* Tr. at 82:12–84:1.  Specifically, Mr. Rutherford can recall spending the night

at the Pelican Hill Resort in Irvine, California, and a Best Western in Newport Beach, California. *See id.* at 83:1–9. Mr. Rutherford spent the night in Newport Beach because he was meeting with his lawyers. *See id.* at 83:13–16. Mr. Rutherford also spent the night at the Sofia Hotel in San Diego, California, the night before his deposition, *see id.* at 83:17–21, although he could not recall staying at another San Diego hotel in the last three years. *See id.* at 83:22–84:1. Ms. Filardi also could not recall staying in a hotel in San Diego except for the night before the evidentiary hearing in this case, *see id.* at 133:21–25, although she testified that she "would like to" travel to San Diego in the future because "[i]t's a great city." *See id.* at 134:10–14. As of Mr. Rutherford's October 16, 2018 deposition, he had no plans to stay at any San Diego hotel. *See* Rutherford Depo. at 72:21–23.

Mr. Rutherford files lawsuits on behalf of the disabled as a "tester," which is somebody who assesses whether facilities are complying with the ADA's accessibility requirements. *See* Tr. at 106:20–107:5. Pursuing mobility issues is "very important" to him. *See id.* at 107:13–22. Indeed, at his deposition, Mr. Rutherford testified that he had stayed at a Hilton in Irvine for "[b]usiness," the nature of which was "consulting with [his] attorneys." *See* Rutherford Depo. at 69:13–19.

As of the date of the evidentiary hearing, Mr. Rutherford had filed 25 lawsuits in the Superior Court for the State of California, Riverside County since 2018, *see* Def.'s RJN Ex. G; one lawsuit in each of Los Angeles and Orange County Superior Courts, *see id.* Exs. H–I; and 313 lawsuits since 2015 in this District and the Central District of California. *See id.* Ex. J. Despite having been involved in well over 300 cases, however, as of his October 16, 2018 deposition, Mr. Rutherford believed he had been involved in fewer than 100 lawsuits total. *See* Rutherford Depo. at 43:2–13. Although Mr. Rutherford has active ADA cases, he does not know how many are pending or whom he has sued. *See* Tr. at 86:20–87:2. He also does not know how many hotels he has sued, *see id.* at 64:15–23, and is "not able to name all the hotels that [he has] sued." *See id.* at 69:6–8.

/ / /

12

One of the hotels Mr. Rutherford has sued is the Pelican Hill Resort, against which both Mr. Rutherford and Ms. Filardi filed a putative class action after being "unable to locate any information regarding the accessibility of the hotel and guest rooms by the mobility impaired, any accessible features of accessible rooms, or the accessibility of any aspect of the resort by the mobility impaired." *See id.* at 65:22–66:12, 67:9–16; *see also generally id.* at 63:17–69:4, 129:14–132:14. Mr. Rutherford may also have sued the Pelican Hill Resort on a second occasion following "substantial problems when we stayed there, accessibility problems," *see id.* at 64:9–12, 66:18–67:5; *see also id.* at 130:15–24, although both Mr. Rutherford and Ms. Filardi seemed confused as to the number and nature of their lawsuit(s) against Pelican Hill Resort. *See id.* at 63:21–64:2, 64:9–14, 66:13–67:5 (Mr. Rutherford); 130:4–5, 130:25–131:14 (Ms. Filardi). Mr. Rutherford testified that he and Ms. Filardi had "actually stay[ed]" at the Pelican Hill Resort, *see id.* at 63:17–18, 68:5–6, but Ms. Filardi clarified that they had not spent the night "[b]ecause it was not accessible to [her]." *See id.* at 130:15–21. Mr. Rutherford could not recall when he had filed his lawsuit against the Pelican Hill Resort, *see id.* at 64:3–5, 68:2–4, or how he made a reservation to stay there. *See id.* at 68:10–12.

Mr. Rutherford also sued the Caravan Hotel Group, *see generally id.* at 69:9–71:2, which owns the El Morocco Inn, *see id.* at 81:21–23, although he could not recall the hotel, *see id.* at 69:9–11; where it was located, *see id.* at 69:12–20; why he had wanted to stay there, *see id.* at 69:21–23; why he had sued it, *see id.* at 69:24–70:1; or even that he had filed a lawsuit against it. *See id.* at 70:2–3. Mr. Rutherford testified that he had "tried staying" at the El Morocco Inn but that he did not actually stay there. *See id.* at 81:18–82:3.

Mr. Rutherford also sued the Pacifica Hotel Company, *see generally id.* at 71:4–72:22, which owns the Ramada Costa Mesa. *See id.* at 71:17–20. Although Mr. Rutherford thought that the Pacifica Hotel Company sounded familiar, *see id.* at 71:4–7, he had no recollection of suing it, *see id.* at 71:8–9, and thought that the hotel it

/ / /

owned may have been located in San Diego.[5]  *See id.* at 71:10–11.  Mr. Rutherford was "not 100-percent certain," but thought that he may have stayed at the Ramada Costa Mesa sometime in 2017 or 2018.  *See id.* at 81:2–14.

Mr. Rutherford also sued the Quality Inn in Lake Forest.  *See generally id.* at 72:24–75:16.  Although Mr. Rutherford was certain that he had sued a Quality Inn, *see id.* at 72:24–25, he was not sure how many times he had sued a Quality Inn, *see id.* at 73:1–2, 73:9–12, or where the Quality Inn(s) was located.  *See id.* at 73:3–8, 73:13–17, 74:1–3.  He also could not recall visiting Lake Forest, *see id.* at 73:18–19; filing a complaint against the Quality Inn in Lake Forest, *see id.* at 73:20–22; anything that was wrong with the Quality Inn in Forest, *see id.* at 73:23–25, 74:25–75:11, or even whether he had stayed there.  *See id.* at 80:25–81:1.

Mr. Rutherford also sued the Rodeway Inn in Indio, *see generally id.* at 75:18–78:1, but he could not recall when he had sued it, *see id.* at 75:22–25, or why he had wanted to stay there.  *See id.* at 76:1–2.  Mr. Rutherford recalled that "there were issues regarding parking and path of travel and accessible entrance," *see id.* at 76:5–6, but could not recall other issues with the property, *see id.* at 76:7–8, such as the accessibility of the swimming pool.  *See id.* at 77:12–17.  Mr. Rutherford did not stay at the Rodeway Inn.  *See id.* at 80:22–24.

Mr. Rutherford also sued the Regency Inn and Suites, *see generally id.* at 78:3–79:8, although he could not recall where it was located, *see id.* at 78:5–8; what he had perceived as wrong with it aside from general "accessibility issues," *see id.* at 78:9–10, 78:22–79:3; or why he had wanted to stay there.  *See id.* at 78:19–21.  Mr. Rutherford did not stay at the Regency Inn and Suites.  *See id.* at 80:19–21.

Finally, Mr. Rutherford also sued Travel Lodge in Hemet, *see generally id.* at 79:10–80:15, although he thought he had sued the one in Napa.  *See id.* at 79:12–14.  Mr. Rutherford could not recall whether he had sued more than one Travel Lodge.  *See id.*

---

[5] Costa Mesa is located in Orange County, California.

at 79:15–19.  Mr. Rutherford could vaguely recall visiting the Travel Lodge in Hemet, *see id.* at 80:5–6, although he could not recall when he had visited.  *See id.* at 80:7–12.  Despite visiting the property, Mr. Rutherford did not stay at the Travel Lodge in Hemet.  *See id.* at 80:16–18.

Indeed, at one point during cross-examination after being handed a handful of his own ADA complaints, Mr. Rutherford remarked:  "Do I need to mark these?  Because they're starting to add up here and I can't tell one from the other."  *See id.* at 74:5–7.  Mr. Rutherford could not recall the amount of any settlements received in any of these specific lawsuits, *see id.* at 85:9–86:19, or what an average settlement figure might be.  *See id.* at 85:6–8.  Mr. Rutherford has also entered into an unknown number of settlements with entities he has not formally filed an ADA lawsuit against.  *See id.* at 84:22–85:1.

Ms. Filardi is also a prolific litigator, having filed at least 31 lawsuits in the Central District of California since 2015.  *See* Def.'s RJN Ex. K.  Like Mr. Rutherford, she could not remember the number of ADA lawsuits in which she had been involved, *see id.* at 135:5–9; how many she had filed with Mr. Rutherford, *see id.* at 135:20–22; or against which businesses she was currently litigating.  *See id.* at 135:10–19.  She was not sure whether she ever previously had sued a business located in San Diego County, *see id.* at 135:23–136:6, or how much she had received from ADA-related litigation and settlements.  *See id.* at 136:7–13.  Unlike Mr. Rutherford, however, Ms. Filardi has never settled a claim where an ADA complaint has not been filed.  *See id.* at 136:23–25.

Nonetheless, Ms. Filardi does not consider suing businesses to be her "job."  *See id.* at 138:5–6.  Rather, she testified that pursuing mobility-related litigation is "extremely important to" her, *see id.* at 139:3–5, because performing daily life activities for a disabled person can be "a struggle, and [Ms. Filardi] do[es]n't think this should be a struggle."  *See id.* at 139:16–18.  Having to ensure that facilities are accessible is "an added burden every time [a disabled person] go[es] out[, a]nd [Ms. Filardi] think[s] that limits a lot of people from actually going out and enjoying their life when they're disabled, because it's a pain to have to do that every time you go out."  *See id.* at 140:1–5.

Mr. Rutherford has returned to facilities he has sued to check compliance, but he has never returned to a hotel he has sued to spend the night. *See id.* at 149:11–150:7. At his deposition, he could recall having stayed at only two hotels for leisure.[6] *See* Rutherford Depo. at 70:2–71:7.

### G.   *Mr. Rutherford's and Ms. Filardi's Experience with Defendant's Hotels*

Defendant owns three hotels in San Diego, California: the Bahia Resort Hotel, The Lodge at Torrey Pines, and the Catamaran Resort (the "Hotels"). *See* SAC ¶ 25. The Hotels were constructed to be compliant with the 1991 ADA standards. *See* Tr. at 156:1–16. They are all located at least 145 miles from Mr. Rutherford and Ms. Filardi's residence, *see* Def.'s Exs. 205–07, and at least 140 miles from the Association's post office box. *See* Def.'s Exs. 208–10.

Mr. Rutherford and Ms. Filardi have "been desiring to go [to] San Diego for years." Tr. at 61:23–24. As of October 16, 2018, however, Mr. Rutherford could not specifically recall having visited San Diego before. *See id.* at 62:1–63:7; *see also* Rutherford Depo. at 52:20–53:17. He also could not recall why he ultimately decided not to stay in San Diego after researching Defendants' Hotels and others, *see* Rutherford Depo. at 194:18–195:2, and he did not believe that he and Mr. Filardi had stayed in another location instead. *See id.* at 195:4–5.

Regarding their reasons for wishing to stay at Defendant's hotels in particular, Mr. Rutherford testified that Defendant's Hotels "are resorts . . . [that] have a very good reputation. They are places you can go and have a good time, spend some time. That was our intention. Our intention was to go away someplace where we could really enjoy ourselves, get away, spend a few days there and just enjoy being away from the desert." Tr. at 148:2–13. As for the Lodge, "[Ms. Filardi's] uncle had stayed there at one point, and he was effusive about how great it was to be there and how much he enjoyed himself,

---

[6] Mr. Rutherford also included the Sofia Hotel in San Diego as a hotel he had stayed at for "leisure," *see* Rutherford Depo. at 71:5–6, but he had stayed there the night before his deposition. *See id.* at 64:17–21.

and so I guess the short answer [for why we wanted to stay there] is, you know, a recommendation, referral." *Id.* at 148:14–20. Mr. Rutherford testified that did not know that the Hotels were related to each other at the time he was researching them. *See* Rutherford Depo. at 168:3–16.

At Mr. Rutherford's October 16, 2018 deposition, Mr. Rutherford could not recall the first time he had visited any of the websites for Defendant's Hotels (the "Websites") or what time of day it was. *See* Tr. at 58:10–21, 89:5–18. He also could not remember what device he used to access the Websites or whether he had visited the Websites more than once in the prior two years. *See id.* at 87:16–88:13, 89:21–90:10.

When testifying on July 1, 2019, however, Mr. Rutherford's recollection improved. *See id.* at 59:2–5. At the evidentiary hearing, Mr. Rutherford testified that, sometime in late 2017, he first investigated the possibility of staying at one of Defendant's Hotels. *See* Tr. at 28:23–29:5. As part of that investigation, Mr. Rutherford and Ms. Filardi visited the Websites of each of Defendant's three Hotels to determine whether the Hotels and rooms were accessible. *See id.* at 29:21–30:23, 121:15–17. Mr. Rutherford recalled that the Bahia's website indicated that the rooms were "accessible," although that alone was insufficient for him to determine whether the room was sufficiently accessible for him. *See id.* at 30:24–32:16. As for the Catamaran, Mr. Rutherford found "[n]othing that would help [him] to be able to make a determination as to whether or not [he] wanted to stay there." *See id.* at 33:3–34:4. Specifically, the website again advertised that the rooms were "accessible," which "d[id]n't give [him] any detail about what is going to be found in the room, if it's going to have a roll-in shower. It says nothing."[7] *Id.* at 34:5–15. Finally, as

---

[7] At his deposition, Mr. Rutherford testified that "accessibility is subject to interpretation." Rutherford Depo. at 101:14; *accord id.* at 102:23. "[I]f you know all the specs [in the ADA] and you say, . . . when we say 'accessibility,' we're saying that we conform with the standard for accessible design. But unless that's said, unless that's understood, then you don't know that you can -- you can't presume that because someone tells you something is accessible that it means that it's really accessibly because a lot of people have faulty conceptions of what's actually accessible." *Id.* at 101:11–25. Nonetheless, Mr. Rutherford testified, he would not "feel more comfortable" if a hotel's website "had the word 'ADA' in here." *See id.* at 106:19–107:3. Instead, he would "like the website to describe the dimensions or measurements,"

for The Lodge, Mr. Rutherford testified that its website "made a vague reference to having an accessible room with a roll-in shower," which was "totally insufficient" for Mr. Rutherford "to make a decision regarding whether the room w[ould] meet [his] needs." *Id.* at 34:20–35:17. Ms. Filardi similarly concluded that the Websites did not contain information regarding the accessibility features Ms. Filardi wanted. *See id.* at 121:23–122:1, 122:14–18, 124:21–125:2 (The Lodge); 126:4–14 (Catamaran); 127:2–12 (Bahia).

Based on his review of Defendant's Websites, Mr. Rutherford concluded that they were "devoid of any meaningful information that would allow [him] to make a decision on renting an accessible room for [himself] and [Ms. Filardi]." *Id.* at 36:7–13. Consequently, he did not attempt to book a room through Defendant's reservation system(s) because "[t]here would [have] be[en] no point in that" given that he "didn't know anything about the accessibility of the room or the hotel." *Id.* at 36:14–21. Since filing this action, Mr. Rutherford also has learned through discovery that reserving an accessible room at one of Defendant's Hotels "requires a person such as [him]self or Patricia to take extra steps which are not normally required to be able to reserve a room of [their] choosing." *Id.* at 37:22–38:12.

The cumulative result of the insufficiencies Mr. Rutherford identified with Defendant's Websites is that he "feel[s] singled out due to [his] disability that [he is] . . . required to go through extra steps that people who don't have a disability do not have to go through." *Id.* at 40:13–20. Consequently, he has not attempted to book a room at one of Defendant's Hotels since his initial investigation, *id.* at 41:21–23, although he did return

---

*see id.* at 107:4–18, although he does not know whether "websites for hotels are required to indicate dimensions of the features on the website." *See id.* at 107:19–22. Mr. Rutherford thought that he had visited some "websites that [he] felt were compliant with the ADA for [his] personal needs," *see id.* at 135:24–136:4, although he could not recall and specifics and testified that he "was surprised to find a couple. Very few." *See id.* at 136:6–8. Similarly, "it's been our experience, Patricia and I both, that we can't always rely on the information that we get from the people who we speak to at the hotels. . . . Generally, people will say, oh, yeah, we have accessible rooms, they're all ADA-accessible." *See id.* at 159:19–160:7.

to the Websites before the Association's deposition in San Diego. *Id.* at 41:24–42:13. Again, Mr. Rutherford did not attempt to reserve a room at any of Defendant's Hotels at that time because of "what [he] perceived as being obstacles to being able to reserve a room," namely, that "[t]he procedure didn't quite make sense to [him]" because he "couldn't just go to the website, pick out a room[,] and reserve it." *Id.* at 42:14–43:5.

If the accessibility issues on Defendant's Websites were addressed, Mr. Rutherford testified that there was "[n]o question" that he would stay at any of Defendant's Hotels, and "[p]articularly the Lodge at Torrey Pines." *See id.* at 148:21–149:3. Mr. Rutherford estimated that he and Ms. Filardi "could probably [afford to] stay 30, 40, 50, 60 days, if we wanted to, overnight [at hotels in Southern California per year]." *Id.* at 149:4–10.

# ANALYSIS

## I.   Evidentiary Issues

Although the Court ruled on the vast majority of the Parties' evidentiary objections at the hearing, it reserved ruling on the admissibility of Plaintiffs' PageFreezer archives of the Websites from January 18, 2018, June 15, 2018, and June 19, 2019, *see* Tr. at 117:19–21, 118:19–20, 146:17–147:6, and requested that the Parties submit supplemental briefing on the issue. *See id.* at 158:4–8.

Analogizing to the Internet Archive's Wayback Machine, *see* Pls.' Supp. Br. at 3, Plaintiffs urge that the PageFreezer archives of the Websites are (1) properly authenticated by PageFreezer's CEO and therefore admissible under Federal Rule of Evidence 901, *see* Pls.' Supp. Br. at 4–6; (2) relevant under Federal Rule of Evidence 401 because they indicate "whether Defendant's online-reservation system contained descriptions of accessible features with sufficient specificity for Plaintiff to know whether the hotels met his accessibility needs" and, "on the date the archive was captured, if anything, the Websites would have only *added* accessibility-related content since the lawsuit was filed," Pls.' Supp. Br. at 6–7 (emphasis in original); and (3) not hearsay under Federal Rules of Evidence 803(6) (business records) and 801(d)(2) (opposing party statement) or as

/ / /

"testimony generated by a machine." Pls.' Supp. Br. at 7 & n.6 (citing Christopher B. Mueller & Laird C. Kirkpatrick, *Evidence Under the Rules* 122 (7th ed. 2011).

Defendants counter that the "Internet Archive offers a distinctly different service that PageFreezer," Def.'s Closing Br. at 19, because "the Internet Archive is a nonprofit, publicly available service accessible for free" with "an explainable system for how it works to gather content and how gathered content is stored." *Id.* at 20. "PageFreezer, on the other hand, is a private, paid for service which is purporting to gather specific documentation requested by its customers for litigation" that "has provided no declaration describing the manner in which it gathers any such records, the process it utilized to do so or the description of how the contend is stored." *Id.* at 20. Further, "Plaintiffs have not identified, and Defendant has not located, a single case in which PageFreezer documents have been admitted." *Id.* at 19.

Defendants additionally argue that, first, the PageFreezer archives are not relevant because "Plaintiffs presented no evidence they visited the Evans Hotels' properties websites on any of the[] dates" on which the PageFreezer archives were captured and "the contents of the Evans Hotels' properties websites on subsequent dates is not relevant to whether or not Plaintiffs encountered any barriers when they visited the websites." Def.'s Closing Br. at 15. "Furthermore, the PageFreezer snapshots . . . are not relevant because they do not include snapshots from the Evans Hotels' properties['] online reservation systems" and, in any event, "Plaintiffs never actually accessed the hotel reservation systems so as to encounter this content." *Id.* Second, Defendants urge that the PageFreezer archives are not properly authenticated because "[d]ocuments prepared specifically for use in litigation are . . . dripping with motivations to misrepresent," *id.* at 16 (quoting *AMPAT Midw., Inc. v. Ill. Tool Works Inc.*, 896 F.2d 1035, 1045 (7th Cir. 1990)) (citing *U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1043–44 (9th Cir. 2009)), and the authenticating declaration—which was "submitted untimely in violation of the Court's Order," *id.* at 16 n.6—"is hearsay and unreliable." *Id.* at 16. Third, Defendants contend that the PageFreezer archives are not the "best evidence" given that they "are not certified

20

and contain handwritten notes and post-its by unknown sources which most certainly were not present when the documents were prepared." *Id.* at 17.  Finally, Defendants argue that the PageFreezer documents are not business records because they "were made at some date subsequent to when Plaintiffs viewed the Evans Hotels' properties websites . . . by some unknown person . . . and w[ere] prepared specifically for litigation." *Id.* at 19.

As an initial matter, the Court declines to consider the declaration of Michiel Riedijk (the "Riedijk Declaration"), which was not timely listed in the Parties Joint Witness and Exhibit List.  *See* ECF No. 67.  The Court explicitly "***CAUTIONED***" the Parties "*that any witnesses or exhibits not listed in the Parties' joint list of witnesses and exhibits shall not be admitted and considered at the hearing.*"   ECF No. 66 at 2 (emphases in original).  Defendant further contends that Plaintiffs failed to provide it with a copy of the Riedijk Declaration until the afternoon of June 28, 2019, the Friday before Monday's evidentiary hearing.  *See* Def.'s Closing Br. at 16 n.6; *see also* Tr. at 146:7–16.  In light of the Court's explicit admonition that it would not entertain untimely exhibits, the Court concludes that the Riedijk Declaration is not admissible.  *See, e.g.*, Fed. R. Civ. P. 16(f)(1)(C); *Brown v. Uttecht*, 530 F.3d 1031, 1037 (9th Cir. 2008) ("[A] district court[ ha]s broad 'discretion to exclude an exhibit not identified in the pretrial order.'") (quoting *Swinton v. Potomac Corp.*, 270 F.3d 794, 809 (9th Cir. 2001)).

Although the PageFreezer archives are not hearsay, *see, e.g.*, *Hernandez v. XPO Logistics Freight, Inc.*, No. 218CV01034ODWMRW, 2018 WL 1804692, at *5 (C.D. Cal. Apr. 16, 2018) (statement from the defendant's own website not hearsay when offered against the defendants); *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1155 (C.D. Cal. 2002); *see also Abu-Lughod v. Calis*, No. CV 13-2792 DMG (RZX), 2015 WL 12746198, at *3 (C.D. Cal. May 20, 2015) ("Further, 'to the extent these images and text are being introduced to show the images and text found on the websites, they are not statements at all—and thus fall outside of the ambit of the hearsay rule.'") (quoting *Telewizja Polska USA, Inc. v. Echostar Satellite Corp.*, No. 02 C 3293, 2004 WL 2367740, at *5 (N.D. Ill. Oct. 15, 2004)), the Court concludes that they are neither properly

authenticated nor relevant.  At his deposition, Mr. Rutherford could not confirm that the printouts represented "what the website looked like when [he] looked at it in 2017."  *See* Rutherford Depo. at 172:12–21.   Further, at the hearing, Mr. Rutherford's counsel conceded that Plaintiffs were "not trying to tell the Court that [Mr. Rutherford] looked at any of this."  Tr. at 113:7–9.  Accordingly, the PageFreezer archives captured on January 18, 2018, June 15, 2018, and June 19, 2019, are not relevant given Mr. Rutherford's inability to confirm that the archives were substantially similar to the versions of the Websites he viewed in late 2017.  *See, e.g.*, *Mycoskie, LLC v. Ebuys, Inc.*, 293 F. Supp. 3d 1076, 1084 (C.D. Cal. 2017) (sustaining objection to Wayback Machine archives of terms and conditions on website captured on December 13, 2012 and March 2, 2013, where party offering the documents acknowledged that they were not dated January 31, 2013, the date it registered as a customer of the website proprietor).  The inability to confirm that the archives accurately reflect the contents of the Websites Mr. Rutherford viewed also presents an authentication issue.  *See, e.g.*, *Cook v. J & J Snack Foods Corp.*, No. 2:09-CV-02297-GEB, 2010 WL 3910478, at *5 (E.D. Cal. Jan. 28, 2010) (concluding that website printouts were not properly authenticated where the declarant did "not declare . . . that the print outs accurately reflec[ed] the contents of the websites she viewed").

Like Defendants, *see, e.g.*, Def.'s Closing Br. at 19, the Court also is troubled by the absence of any cases admitting PageFreezer records.   Although Plaintiffs' counsel indicated at the evidentiary hearing that "there are records from this company . . . in many cases," *see* Tr. at 116:16–20, he was "not aware of any specific cases," *see id.* at 117:10–11, and cited no such cases in Plaintiffs' Supplemental Brief.  *See generally* Pls.' Supp. Br. at 3–7.  Like Defendants, *see* Def.'s Closing Br. at 19, the Court has found no cases addressing the admissibility of, let along referencing, "PageFreezer" archives. Coupled with the differences between PageFreezer and the Internet Archive—including that the Internet Archive offers a free, publicly available service whereas PageFreezer offers a paid service in anticipation of litigation—the Court declines to admit the

PageFreezer archives as analogous to those from the Wayback Machine admitted in other litigation.    The Court therefore **SUSTAINS** Defendant's objection to the PageFreezer archives of the Websites, introduced at the evidentiary hearing as Plaintiffs' Exhibits 2, 3, and 4.

## II.    Standing

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "For that reason, both the Supreme Court and [the Ninth Circuit] have held that whether or not the parties raise the issue, [f]ederal courts are *required* sua sponte to examine jurisdictional issues such as standing." *D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1035 (9th Cir. 2008) (second alteration and emphasis in original) (quoting *Bernhardt v. Cty. of Los Angeles*, 279 F.3d 862, 868 (9th Cir. 2001)) (internal quotation marks omitted) (citing *United States v. Hays*, 515 U.S. 737, 742 (1995)).

The plaintiff bears the burden of establishing standing. *Id.* at 1036. To meet its burden, an individual plaintiff must show three things:

> First, [it] must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* (alterations in original) (quoting *Lujan*, 504 U.S. at 560–61).

These requirements must also be satisfied by "a disabled individual claiming discrimination" under the ADA. *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 946 (9th Cir. 2011) (citing U.S. Const. art. III, § 2; *Lujan*, 504 U.S. at 560; *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1081 (9th Cir. 2004)).    A plaintiff with a disability establishes that he has suffered an injury in fact for purposes of the ADA when he demonstrates that he encountered an accessibility barrier that is related to his disability and

/ / /

that interferes with his "full and equal enjoyment" of the facility.  *See id.* at 947 (quoting 42 U.S.C. § 12182(a)).

"In addition, to establish standing to pursue injunctive relief, which is the only relief available to private plaintiffs under the ADA, [the plaintiff] must demonstrate a 'real and immediate threat of repeated injury' in the future."  *Id.* at 946 (footnote omitted) (citing *Fortyune*, 364 F.3d at 1081).  "[A]n ADA plaintiff can show a likelihood of future injury when he intends to return to a noncompliant accommodation and is therefore likely to reencounter a discriminatory architectural barrier."  *Id.* at 950.  "Alternatively, a plaintiff can demonstrate sufficient injury to pursue injunctive relief when discriminatory architectural barriers deter him from returning to a noncompliant accommodation."  *Id.* "[W]here . . . the public accommodation being sued is far from the plaintiff's home, [the Ninth Circuit] ha[s] found actual or imminent injury sufficient to establish standing where a plaintiff demonstrates an intent to return to the geographic area where the accommodation is located and a desire to visit the accommodation if it were made accessible."  *D'Lil*, 538 F.3d at 1037 (citing *Pickern v. Holiday Quality Foods, Inc.*, 293 F.3d 1133, 1138 (9th Cir. 2002); *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1037–38 (9th Cir. 2008)).

A plaintiff suing under Title III of the ADA may also claim "tester standing."  *See Civil Rights Educ. & Enf't Ctr. v. Hosp. Properties Tr.*, 867 F.3d 1093, 1101–02 (9th Cir. 2017) ("*CREEC*").  Consequently, it is irrelevant to the determination of standing that a plaintiff's sole reason for visiting or returning to an establishment is to assess compliance with the ADA.  *See id.* at 1102.

Further, "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Claims for declaratory and injunctive relief do not require individualized proof, thereby satisfying the third prong.  *See id.* at 344.

An evidentiary hearing may be necessary to resolve genuine disputed factual issues concerning standing.  *See Hohlbein v. Hospitality Ventures, LLC*, 248 Fed. App'x 804, 806 (9th Cir. 2007); *see also Duke Power Co. v. Carolina Envt'l Study Grp., Inc.*, 438 U.S. 59, 67–68 (1978).  "Particularly where credibility and veracity are at issue . . . , written submissions are a wholly unsatisfactory basis for decision."  *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970).

"The evidence relevant to the standing inquiry consists of 'the facts as they existed at the time the plaintiff filed the complaint.'"  *D'Lil*, 538 F.3d at 1036 (quoting *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007) (citing *Lujan*, 504 U.S. at 569 n.4)).  "In evaluating whether a civil rights litigant has satisfied these requirements, [t]he Supreme Court has instructed [court]s to take a broad view of constitutional standing . . . especially where, as under the ADA, private enforcement suits are the primary method of obtaining compliance with the Act."  *Id.* (first and third alterations in original) (quoting *Doran*, 524 F.3d at 1039–40 (quoting *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972))) (internal quotation marks omitted).

### A.    Mr. Rutherford's Standing

"[A]n ADA plaintiff can establish standing to sue for injunctive relief either by demonstrating deterrence, or by demonstrating injury-in-fact coupled with an intent to return to a noncompliant facility."  *Chapman*, 631 F.3d at 944.  Mr. Rutherford claims to have satisfied both tests.  *See, e.g.*, SAC ¶ 19; Pls.' Resp. at 1–10; Pls.' Supp. Br. at 18–19; Pls.' Closing Br. at 1–9.

#### 1.    Injury-in-Fact Coupled with an Intent to Return

##### a.    Injury-in-Fact

An ADA plaintiff "lacks standing if . . . the barriers he seeks to enjoin do not pose a real and immediate threat to him due to his particular disability."  *Chapman*, 631 F.3d at 953.  In other words, "to suffer an injury-in-fact arising from an actual encounter with a barrier, an ADA plaintiff must establish that the barrier *relates to* his disability."  *Strojnik v. Host Hotels & Resorts, Inc.*, No. CV 19-00136 JMS-RT, 2020 WL 2736975, at *3 (D.

25

Haw. May 26, 2020) (quoting *Strojnik v. IA Lodging Napa First LLC*, 2020 WL 906722, at \*2 (N.D. Cal. Feb. 25, 2020) (emphasis in original) (citing *Chapman*, 631 F.3d at 947 n.4)) (citing *Doran*, 524 F.3d at 1044 n.7).

Analogizing to the Fair Credit Reporting Act, Plaintiffs urge that the "procedural and intangible harm" Mr. Rutherford experienced as a result of Defendant's alleged violations of the ADA is sufficient to establish injury-in-fact for purposes of Article III standing. *See* Pls.' Supp. Br. at 13–18 (quoting & citing *Robins v. Spokeo, Inc.*, 867 F.3d 1108 (9th Cir. 2017)). This very argument has been rejected by other courts, *see, e.g.*, *Gastelum v. Canyon Hosp. LLC*, No. CV-17-02792-PHX-GMS, 2018 WL 2388047, at \*10 (D. Ariz. May 25, 2018) ("As the Supreme Court held in *Spokeo*, however, [the ADA plaintiff] cannot 'allege a bare procedural violation, divorced from any concrete harm' and maintain standing to bring the lawsuit.") (citing *Spokeo*, 136 S. Ct. at 1549), and, in the absence of Ninth Circuit authority holding that a procedural violation of the ADA is sufficient to confer Article III standing, the Court declines to adopt it here.

The Court also notes that Mr. Rutherford and Ms. Filardi testified to different disabilities and, consequently, different needs, with Ms. Filardi's needs being more restrictive than Mr. Rutherford's. *See generally* Tr. at 8:15–21:21 (Mr. Rutherford's disabilities); *and id.* at 21:22–23:9, 23:25–27:7, 27:12–28:22 (Mr. Rutherford's needs), *with id.* at 44:22–45:4, 139:7–8 (Ms. Filardi's disabilities); *and id.* at 23:10–24, 27:7–10, 121:20–124:25, 127:14–128:1 (Ms. Filardi's needs); *see also id.* at 44:10–45:22, 127:9 (difference between Mr. Rutherford's and Ms. Filardi's needs). Mr. Rutherford alleges that he was denied full and equal access to Defendant's reservations services, not that he was denied full and equal access as a result of his association with Ms. Filardi. *See, e.g.*, SAC ¶¶ 1, 18–19, 50, 61; *see also Huynh v. Bracamontes*, No. 5:16-CV-01457-HRL, 2016 WL 3683048, at \*2 (N.D. Cal. July 12, 2016) ("The parties agree that a plaintiff pleading associational discrimination under 42 U.S.C. § 12182(b)(1)(E) 'must allege some specific, direct, and separate injury as a result of association with a disabled individual.'") (quoting *George v. AZ Eagle TT Corp.*, 961 F. Supp. 2d 971, 974 (D. Ariz. 2013)); *Glass v. Hillsboro*

26

*Sch. Dist. 1J*, 142 F. Supp. 2d 1286, 1288 (D. Or. 2001) ("[T]o state a valid claim for associational discrimination under either statute, a plaintiff must allege some 'specific, direct, and separate injury' as a result of association with a disabled individual."). Consequently, Mr. Rutherford "lacks standing" as to "barriers . . . [that] do not pose a real and immediate threat to him due to his particular disability," *see Chapman*, 631 F.3d at 953, and it is only those barriers related to Mr. Rutherford's disabilities that are relevant to the Court's analysis of his standing.[8]  *See, e.g.*, *Gastelum*, 2018 WL 2388047, at *10 ("It might be easier for both [the plaintiff] and the hotel to allow a disabled person like [the plaintiff] to assert all ADA deficiencies for all disabled persons so that such matters could theoretically be resolved in the course of one lawsuit. But, [the plaintiff] simply does not have standing to assert discrimination for disabilities that he does not have, nor can he assert a failure to comply with regulations that do not discriminate against him.").

This brings the Court to Defendant's challenges. Defendant contends that there is no credible testimony that Mr. Rutherford "encountered" any of the alleged barriers. *See* Def.'s Resp. at 6; Def.'s Tr. Br. at 4–5; Def.'s Closing Br. at 1–7. Although Defendant previously intimated that Mr. Rutherford had not accessed the Websites, it argued in its Closing Brief that "Plaintiffs have not presented any evidence demonstrating their use or enjoyment of the Evans Hotels' websites was first, impeded in any way, and second, that access to the website was minimized as a result of their mobility impairments." Def.'s Closing Br. at 3 (citing Tr. at 29:16–25, 30:12–18, 30:24–31:2, 33:3–4, 33:18–25, 34:20–35:5, 58:10–21, 121:16–122:18, 8:15–21, 19:1, 46:8–24).

/ / /

---

[8] Mr. Rutherford's "preferences" also are not relevant. Mr. Rutherford testified, for example, that it is "nice" to have access to van-accessible parking because it provides "more room" for his rollator, Tr. at 23:25–24:12; that he "like[s] to have grab bars] in the shower," *id.* at 26:8–11; that he "really like[s] to have" a roll-in shower, if possible, *id.* at 26:12–13, because "[t]here's more room in there" and "grab bars . . . are required," *id.* at 26:25–27:7; that he "really like[s]" to have a non-skid floor, *id.* at 28:12–17; and that it is "nice" to have an accessible sink so that he can sit on his rollator while he brushes his teeth. *See id.* at 27:12–22. There is a difference, however, between what Mr. Rutherford "likes" and what he "needs," with only the latter being relevant to Mr. Rutherford's standing.

Plaintiffs counter that they "tried to learn about and reserve rooms using Defendant's exclusive online reservation system – its Websites – and were denied full and equal access, in violation of section 36.302(e)(1) [of Title 28 of the Code of Federal Regulations]," which "also denied access to Defendant's physical hotels." Pls.' Closing Br. at 3 (citing *Chapman*, 631 F.3d at 947). Further, "Defendant concedes its violation of Sections 36.302(e)(1)(i) and (ii) when it acknowledged that its online reservation system only disclosed that certain rooms were 'accessible' with no additional information" because "[c]ommon sense dictates that conclusorily stating that its rooms are 'accessible' is not enough detail for Plaintiffs to assess whether a hotel or guest room meets their particular accessibility needs." *Id.* at 4 (citing Def.'s Closing Br. at 6). First, "Plaintiffs found that no descriptions of accessible features were present when they tried to identify a room to reserve and, accordingly, they could not reserve a room using the Websites, and thus *Plaintiffs had actual knowledge of the illegal barriers in violation section[] 36.302(e)(1)*." *Id.* at 5 (emphasis in original). Second, "Plaintiff Rutherford . . . has actual knowledge of a second, independent barrier to access he learned through review of Defendant's responses to discovery in this case, that all potential guests reserving rooms with accessible features through the Websites are required to complete additional steps and take additional time to reserve an accessible room, over and above those required for other guests." Pls.' Closing Br. at 5.

The Court sees several issues with Mr. Rutherford's claimed encounters with barriers on Defendant's Websites. First, it is clear from Mr. Rutherford's testimony that his mobility- and balance-related disabilities are not consistent because the severity of his condition correlates to "the level of pain" that he is experiencing. *See* Tr. at 21:17–21; *see also id.* at 17:14–23. Sometimes Mr. Rutherford uses a walker or rollator, other times he uses a cane, very rarely he uses a wheelchair, and "at times" he is able to walk unassisted. *See id.* at 17:24–21:16. It is therefore unclear the extent to which Mr. Rutherford required an accessible room at the time he wished to visit Defendant's Hotels. *See, e.g.*, *Strojnik v. Vill. 1017 Coronado, Inc.*, No. 19-CV-02210-BAS-MSB, 2020 WL 3250608, at *4 (S.D.

Cal. June 16, 2020) (dismissing with prejudice ADA lawsuit for lack of standing where, among other things, the "[p]laintiff d[id] not allege when he needs the assistance of a wheelchair or that he needed the assistance of a wheelchair at the time he wished to visit the Hotel.  As such, he has alleged insufficient facts to show even that he was disabled at the time he intended to visit San Diego.") (citing *Rutherford v. Caesar's Mexican Rest., LLC*, No. 19-cv-1416-LAB (JLB), 2019 WL 4193392 (S.D. Cal. Sept. 3, 2019)).

Second, Mr. Rutherford fails to establish injury-in-fact under Section 36.302(e)(1)(i), which provides that "[a] public accommodation that owns, leases (or leases to), or operates a place of lodging shall, with respect to reservations made by any means, including by telephone, in-person, or through a third party . . . [m]odify its policies, practices, or procedures to ensure that individuals with disabilities can make reservations for accessible guest rooms during the same hours and in the same manner as individuals who do not need accessible rooms." 28 C.F.R. § 36.302(e)(1)(i).  Mr. Rutherford contends that Defendants have violated this provision because, after filing this case, "he learned through review of Defendant's responses to discovery . . . that all potential guests reserving rooms with accessible features through the Websites are required to complete additional steps and take additional time to reserve an accessible room, over and above those required for other guests."  Pls.' Closing Br. at 5.  Not only does the operative Second Amended Complaint contain no allegations supporting this theory of liability, *see generally* SAC, but Mr. Rutherford did not attempt to make a reservation through Defendant's Websites.  *See, e.g.*, Tr. at 36:14–21, 41:21–23, 42:14–18, 43:3–5; *see also* Rutherford Depo. at 161:5–164:9.  Plaintiffs nonetheless contend that "Plaintiff Rutherford has previously offered testimony supporting this fact and if allowed he would have done so at the Evidentiary Hearing," Pls.' Closing Br. at 6 (citing Tr. at 37:22–40:7), and that, "[c]onsistent with the binding authority of *CREEC*, the source of Rutherford's knowledge need not be firsthand experience of the subject barrier." *Id.* (citing *CREEC*, 867 F.3d at 1100).

/ / /

It may be true that Mr. Rutherford need not have *personally encountered* the alleged barrier, but he still must have *personal knowledge* of it to establish standing. *See Doran*, 524 F.3d at 1041–42 (holding that, while an ADA plaintiff may challenge barriers he has not personally encountered or about which he does not have personal knowledge once he has established standing, he first must "get[] . . . inside the courthouse door" by demonstrating that he suffered an injury-in-fact by personally encountering or having personal knowledge of at least one barrier); *see also id.* at 1047 ("An ADA plaintiff who has Article III standing as a result of at least one barrier at a place of public accommodation may, in one suit, permissibly challenge all barriers in that public accommodation that are related to his or her specific disability."). *CREEC* is not to the contrary—the plaintiffs in *CREEC* did not personally encounter the barrier (a lack of free, accessible local transport offered by the defendant hotels), but each had personal knowledge of the barrier because she had called the hotel to inquire about the availability of such services. *See* 867 F.3d at 1097. Mr. Rutherford, by contrast, learned of additional steps in Defendant's reservation system for accessible rooms only through discovery in this case. *See* Pls.' Closing Br. at 6. Consequently, Mr. Rutherford's knowledge of the alleged Section 36.302(e)(1)(i) violation is—at best—secondhand, which cannot confer standing.

Third, Mr. Rutherford fails to establish injury-in-fact under Section 36.302(e)(1)(ii), which provides that "[a] public accommodation that owns, leases (or leases to), or operates a place of lodging shall, with respect to reservations made by any means, including by telephone, in-person, or through a third party . . . [i]dentify and describe accessible features in the hotels and guest rooms offered through its reservations service in enough detail to reasonably permit individuals with disabilities to assess independently whether a given hotel or guest room meets his or her accessibility needs." 28 C.F.R. § 36.302(e)(1)(ii). Again, Mr. Rutherford did not visit the reservation pages through Defendant's Websites. *See, e.g.*, Tr. at 36:14–21, 41:21–23, 42:14–18, 43:3–5; *see also* Rutherford Depo. at 161:5–164:9. Having failed to assess any accessibility-related information available through the reservation pages, Mr. Rutherford's contention that there was inadequate

information on the Websites for him to determine whether Defendant's Hotels had rooms meeting his accessibility needs is based on his speculation that no additional information was on those parts of the Websites that he did not attempt to access.   In short, Mr. Rutherford cannot claim that there was insufficient accessibility information on the Websites when his assessment was based only on a portion of those Websites.

Further, Plaintiffs' contention that "[c]ommon sense dictates that conclusorily stating that its rooms are 'accessible' is not enough detail for Plaintiffs to assess whether a hotel or guest room meets their particular accessibility needs," *see* Pls.' Closing Br. at 4, is dubious.   The Department of Justice's own guidance concerning Section 36.302(e)(ii) recognizes that, "[f]or hotels that were built in compliance with the 1991 Standards, it may be sufficient to specify that the hotel is accessible and, for each accessible room, to describe the general type of room (e.g., deluxe executive suite), the size and number of beds (e.g., two queen beds), the type of accessible bathing facility (e.g., roll-in shower), and communications features available in the room (e.g., alarms and visual notification devices)."   28 C.F.R. § Pt. 36, App. A.   For this reason, the Court specifically asked Defendant's counsel at the evidentiary hearing whether the Hotels "were . . . constructed to be compliant with the 1991 ADA Standards."   *See* Tr. at 156:1–3.   Counsel indicated that they were and referred the Court to its brief in opposition to Plaintiffs' motion for class certification.   *See id.* at 156:4–16.   The evidence cited in support of Defendant's brief appears to support that the Hotels offer accessible rooms built in compliance with the 1991 Standards, despite many of the Hotels' original construction date(s) predating those standards.   *See* Decl. of Andy Thomas ("Thomas Decl.," ECF No. 49-3) ¶¶ 4–6.

Mr. Rutherford testified that the Websites described rooms as being "accessible," *see* Tr. at 30:24–31:2, 32:21–24, 34:1–9, 35:6–14, 35:23–25, 103:23–104:16, some even "in some detail."   *See id.* at 104:12.   But just because Mr. Rutherford would like additional detail does not mean that he is entitled to it under Section 36.302(e)(1)(ii).   *See, e.g.*, *Barnes v. Marriott Hotel Servs., Inc.*, No. 15-CV-01409-HRL, 2017 WL 635474, at *9–10 (N.D. Cal. Feb. 16, 2017) (granting summary judgment in favor of the defendant on ADA claim

asserted under Section 36.302(e)(1)(ii) where the hotel "was constructed to be compliant with the 1991 Standards[ and] provides descriptions of accessible features on its website that include the level of detail proposed by the ADA Guidance document.").

For all these reasons, the Court concludes that Mr. Rutherford has failed to establish injury-in-fact under either theory of liability pursuant to Section 32.306(e)(1).

### b. Intent to Return

To establish standing, Plaintiffs also must establish that Mr. Rutherford intends to return to Defendant's facilities. *See Chapman*, 631 F.3d at 944. This requires Mr. Rutherford to "demonstrate[] an intent to return to the geographic area where the accommodation is located and a desire to visit the accommodation if it were made accessible." *D'Lil*, 538 F.3d at 1037 (citing *Pickern*, 293 F.3d at 1138).

As an initial matter, Plaintiffs argue that "[b]ecause this case involves barriers located on the Websites (not services in or at the hotels), the 'intent to return' requirement – after Plaintiff learns of the removal of barriers of the Websites – should naturally be a return only to the Websites and not necessarily the physical hotels." Pl.'s Supp. Br. at 18–19. The Court disagrees. The United States District Court for the District of Arizona, the Honorable G. Murray Snow presiding, confronted a similar issue following a consolidated evidentiary hearing concerning a serial ADA plaintiff's standing in several cases against hotels pending in that district. *See Gastelum*, 2018 WL 2388047. There, as here, the plaintiff alleged that the basis for his ADA claim was that he was unable to determine from the hotel's website whether its rooms were ADA compliant, although he "indend[ed] to book a room at the Defendant's hotel once Defendant . . . removed all accessibility barriers." *See id.* at *1–2. In concluding that the plaintiff had failed to establish standing, the court concluded that a future intent to "book a room" did not suffice:

> [The plaintiff]'s standard avowal in his verified complaints that he intends to "book a room" at each lodging is not sufficient to establish concrete injury, absent a showing that he would likely visit that hotel again (as opposed to merely booking a room) for some purpose other than maintaining his litigation against that

32

1
2

>hotel.  Avowing to a desire to "book a room," is different than
>avowing an intent to actually visit a hotel.

3
4

*Id.* at \*7.  So, too, here—Mr. Rutherford must establish an intent to return to Defendant's Hotels, not just the Websites.

5
6
7
8
9
10
11
12
13
14

"Courts often examine four factors to determine whether a plaintiff had an intent to return: (1) the proximity of the place of public accommodation to plaintiff's residence, (2) plaintiff's past patronage of defendant's business, (3) the definitiveness of plaintiff's plans to return, and (4) the plaintiff's frequency of travel near defendant." *Antonio v. Vanareth Kim Yi*, No. 2:14-CV-04323-SVW-AS, 2015 WL 13603781, at \*2 (C.D. Cal. Mar. 4, 2015) (collecting cases).  In *CREEC*, the Ninth Circuit cited with approval the Eleventh Circuit's decision in *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323 (11th Cir. 2013), which assessed the plaintiff's "prior visits, proximity of residence to [the establishment], plans for future visits, and status as an 'ADA tester who has filed many similar lawsuits.'" *CREEC*, 867 F.3d at 1100 (quoting *Houston*, 733 F.3d at 1335–37).

15
16
17
18
19
20
21
22
23
24
25
26

"Regarding the first factor, generally, if the plaintiff resides over one hundred miles away from the place of public accommodation, 'the distance subverts a professed intent to return.'" *Strojnik v. Four Sisters Inns, Inc.*, No. 219CV02991ODWJEMX, 2019 WL 6700939, at \*4 (C.D. Cal. Dec. 9, 2019) (quoting *Antonio v. Yi*, No. 2:14-CV-04323-SVW (ASx), 2015 WL 13603781, at \*2 (C.D. Cal. Mar. 4, 2015) (citing *Harris v. Stonecrest Care Auto Ctr., LLC*, 472 F. Supp. 2d 1208, 1217 (S.D. Cal. 2007)).  "However, this factor is 'less relevant when applied to hotels, because it is generally the purpose of hotels to provide a place to stay away from someone's residence.'" *Id.* (quoting Order Granting Defendant's Motion to Dismiss, *Strojnik v. Orangewood LLC*, No. 8:19-cv-00946-DFS-GJS, at 11 (C.D. Cal. Aug. 8, 2019), ECF No. 34).  Consequently, although Mr. Rutherford resides more than one hundred miles from any of Defendant's Hotels, *see* Def.'s Exs. 205–07, this factor is of limited relevance.

27
28

The remaining factors undermine Mr. Rutherford's professed intent to return to Defendant's Hotels.  Mr. Rutherford has not previously stayed at any of Defendant's

Hotels—indeed, prior to his deposition in this case, he could not recall having visited San Diego. *See* Tr. at 62:1–63:7, 83:22–84:1; *see also* Rutherford Depo. at 52:20–53:17. Mr. Rutherford also had no concrete plans to stay at a San Diego hotel as of his October 16, 2018 deposition or at the July 1, 2019 evidentiary hearing.[9]   *See* Rutherford Depo. at 72:21–23; Tr. at 61:10–25.   Not only has Mr. Rutherford not spent the night in a San Diego hotel except for when deposed in this case, *see* Tr. at 62:1–63:7, 83:22–84:1; *see also* Rutherford Depo. at 52:20–53:17, but he infrequently spends the night at hotels generally. *See, e.g.*, Rutherford Depo. at 70:2–71:7.   Considering the relevant factors, the Court determines that Mr. Rutherford has failed to establish an intent to return to Defendant's Hotels. *See, e.g.*, *Kristoffersen v. RVS110, LLC*, No. 3:18-CV-0392-BEN-AGS, 2019 WL 1877183, at *3 (S.D. Cal. Apr. 26, 2019) ("Although Plaintiff's vague desire to stay at the Motel *some day*—'whenever she visits San Diego' and 'need[s] a place to stay'—might withstand a Rule 12(b)(1) motion to dismiss, Plaintiff does not carry her burden to demonstrate standing at the summary judgment stage" because "[s]he offers no evidence of any plans or a general intention to visit San Diego in the future" or "reasons why she might visit San Diego in the future or why she would stay in Defendant's Motel," and "the evidence shows Plaintiff has visited San Diego only three times in her life, including the visit that led to her lawsuit") (emphasis in original); *Gastelum*, 2018 WL 2388047 at *10 (dismissing nine ADA complaints filed by serial ADA plaintiff following consolidated evidentiary hearing where the plaintiff testified to a single visit to a hotel that did not result in an overnight stay and "ha[d] not pled any facts about a specific plan to return or about why he is likely to want to stay or visit at Defendant's hotel in the future" and, "[a]t the evidentiary hearing, . . . could not remember why he had been interested in staying at the [defendant's] hotel"); *Harris*, 472 F. Supp. 2d at 1216 (dismissing with prejudice ADA

---

[9] Although standing is to be assessed based on facts as they existed at the time the action was filed, *see D'Lil*, 538 F.3d at 1036, that intention can be "the obvious and most reasonable inference to be drawn from [a plaintiff's] testimony" regarding the frequency with which a plaintiff traveled to the area both before and after filing suit. *See id.* at 1038 & n. 8.

claim for lack of subject-matter jurisdiction following bench trial where "[a]ll four factors, in varying degrees, weigh against finding Plaintiff has standing in this case"); *Molski*, 405 F. Supp. 2d at 1168–69 (concluding that the plaintiff had failed to establish standing where, following an evidentiary hearing, "all factors weigh heavily against finding standing in this case"); *see also, e.g.*, *Langer v. Badger Co., LLC*, No. 18CV934-LAB (AGS), 2019 WL 2269951, at *3 (S.D. Cal. May 24, 2019) ("[The plaintiff]'s allegations regarding his intent to return are fairly thin.  He does not allege he has ever been to the tavern before or explain why he chose to go there as opposed to some other tavern or bar.  No facts other than his expressed intent to return at some point suggest a reasonable likelihood he will return.") (citing *Lujan*, 504 U.S. at 564; *Langer v. H&R LLC*, No. 2:18-CV-00586 AB (PJWx), 2018 WL 6039823, at *2 (C.D. Cal., Aug. 13, 2018)).

This, of course, assumes that the Court can take Mr. Rutherford at his word when he claims that there is "[n]o question" that he would stay at any of Defendant's Hotels once the alleged deficiencies with Defendant's Websites are addressed.  *See* Tr. at 148:21–149:3.  For a number of reasons, the Court concludes that it cannot:  "Plaintiff's litigation history, coupled with a contradictory factual record, raises serious credibility questions and calls into question Plaintiff's stated purpose for visiting the [Websites]."  *See Vogel v. Sym Props., LLC*, No. CV 15-09855-AB (ASX), 2017 WL 4586348, at *6 (C.D. Cal. Aug. 4, 2017).

"*First*, though past litigation history alone is not sufficient to impugn a plaintiff's credibility, courts do consider prior suits in evaluating a plaintiff's stated intent to return to a particular establishment."  *Id.* (citing *D'Lil*, 538 F.3d at 1040).  Here, Mr. Rutherford is a prolific ADA tester who has filed hundreds of lawsuits against Southern California establishments, including a number of hotels.[10]  "While the Court acknowledges

---

[10] Indeed, by the Court's count, including this case, Mr. Rutherford has filed twenty-four cases against hotels in this District alone as of August 1, 2020.  *See Rutherford v. Mandira Invs., LLC*, No. 20-CV-826 AJB (BGS) (S.D. Cal. filed May 1, 2020); *Rutherford v. Mehul Hospitality, LLC*, No. 20-CV-348 H (JLB) (S.D. Cal. filed Feb. 25, 2020); *Rutherford v. Chang*, No. 19-CV-2350 JAH (NLS) (S.D. Cal. filed Dec. 9, 2019); *Rutherford v. Korol Capital LLC*, No. 19-CV-1862 BAS (KSC) (S.D. Cal. filed Sept. 26,

35

Mr. [Rutherford's] right to file ADA lawsuits to remedy denial of access violations, the reality is he has sued so many different establishments that it is impossible to believe he routinely visits the same establishments on each of his visits to San Diego." *Harris*, 472 F. Supp. 2d at 1213 (collecting cases).  This is particularly true in light of Mr. Rutherford's testimony that he has spent the night in only one San Diego hotel, the night before his deposition in this case, *see* Tr. at 62:1–63:7, 83:22–84:1; *see also* Rutherford Depo. at 52:20–53:17, and that he has never returned to a hotel he has sued to spend the night.  *See* Tr. at 149:11–150:7.  The infrequency of Plaintiff's past patronage of San Diego hotels, coupled with the volume of lawsuits filed against San Diego hotels and Mr. Rutherford's failure to spend the night at any hotels he has sued in the past, undermine the credibility of Mr. Rutherford's professed intent to return to any of Defendant's Hotels.  *See, e.g.*, *Strojnik*, 2020 WL 3250608, at *3 (taking judicial notice of the fact that the plaintiff had filed ADA complaints against 22 other lodging establishments in San Diego and concluding that "[i]t defies credulity that Plaintiff intends to visit over twenty different [lodging] establishments in San Diego when he lives in Phoenix") (citing *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996)); *Molski v. Mandarin Touch Rest.*, 385

---

2019); *Rutherford v. 1440 Mission Ave., LLC*, No. 19-CV-1861 WQH (MDD) (S.D. Cal. filed Sept. 26, 2019); *Rutherford v. Palm Tree Hospitality Corp.*, No. 19-CV-1569 JLS (WVG) (S.D. Cal. filed Aug. 20, 2019); *Rutherford v. La Jolla Riviera Apartment House LLC*, No. 19-CV-1349 JM (MDD) (S.D. Cal. removed July 19, 2019); *Rutherford v. JC Resorts, LLC*, No. 19-CV-665 BEN (NLS) (S.D. Cal. filed removed Apr. 9, 2019); *Rutherford v. Gurudev Enters. LLC*, No. 19-CV-251 JLS (NLS) (S.D. Cal. filed Feb. 4, 2019); *Rutherford v. Rodeway Inn*, No. 18-CV-2276 AJB (MDD) (S.D. Cal. filed Sept. 28, 2018); *Rutherford v. Day's Inn El Centro*, No. 18-CV-2275 GPC (AGS) (S.D. Cal. filed Sept. 28, 2018); *Rutherford v. Motel 6*, No. 18-CV-2210 GPC (WVG) (S.D. Cal. filed Sept. 24, 2018); *Rutherford v. Econo Lodge Inn & Suites*, No. 18-CV-2026 GPC (LL) (S.D. Cal. filed Aug. 29, 2018); *Rutherford v. Pacifica Diamond LLC*, No. 18-CV-1801 CAB (JLB) (S.D. Cal. removed Aug. 2, 2018); *Rutherford v. Pacifica S. Inn LLC*, No. 18-CV-1798 JLS (BLM) (S.D. Cal. removed Aug. 2, 2018); *Rutherford v. Comfort Inn & Suites El Centro I-8*, No. 18-CV-1768 WQH (KSC) (S.D. Cal. filed July 31, 2018); *Rutherford v. Americas Best Value Inn*, No. 18-CV-1734 CAB (BGS) (S.D. Cal. filed July 27, 2018); *Rutherford v. Best W.*, No. 18-CV-1733 KSC (S.D. Cal. filed July 27, 2018); *Rutherford v. Holiday Inn*, No. 18-CV-1730 LAB (JMA) (S.D. Cal. filed July 27, 2018); *Rutherford v. Royal Motel*, No. 18-CV-1501 LAB (RBB) (S.D. Cal. filed June 29, 2018); *Rutherford v. Econolodge*, No. 18-CV-1471 LAB (LL) (S.D. Cal. filed June 27, 2018); *Rutherford v. Evans Hotels, LLC*, No. 18-CV-435 JLS (MSB) (S.D. Cal. removed Feb. 26, 2018); *Peterson v. Watkins*, No. 17-CV-1078 BAS (JLB) (S.D. Cal. filed May 24, 2017); *Rutherford v. La Quinta Holdings*, No. 17-CV-819 DMS (JLB) (S.D. Cal. filed Apr. 24, 2017).

36

F. Supp. 2d 1042, 1046 (C.D. Cal. 2005) (concluding that the plaintiff had failed to demonstrate an intent to return to an establishment where the plaintiff "testified that, of the businesses he had sued, he had visited 'less than 10 percent' on more than one occasion" and "that he had returned to less than one percent of businesses with whom he had reached a settlement," a "track record demonstrat[ing] that he rarely returns to the businesses that he sues").

Indeed, Mr. Rutherford has sued so many establishments that he does not recall which, *see* Tr. at 69:6–8, or how many hotels he has sued. *See id.* at 64:15–23. Defendant's counsel skillfully underscored the predicament posed by Mr. Rutherford's extensive litigation history: not only could Mr. Rutherford not recall several of the hotels he had sued, but he could not recall where many were located, why he had wanted to stay there, or the alleged violations on which his lawsuits were premised. *See generally id.* at 63:17–82:3. Indeed, four complaints in, Mr. Rutherford asked, "Do I need to mark these? Because they're starting to add up here and I can't tell one from the other." *Id.* at 74:5–7. "Mr. [Rutherford's] having sued a number of establishments he cannot now remember strongly suggests he no longer patronizes or even visits the establishments he has litigated against." *Harris*, 472 F. Supp. 2d at 1213 n.3.

Defendant also contends that Mr. Rutherford's credibility is suspect because "Plaintiffs' motivations are oriented towards weaponizing the ADA for money." *See* Defs.' Closing Br. at 12. While the volume of Mr. Rutherford's filings and his "tacking on state law claims for Unruh damages to his federal ADA complaints" may reveal a profit motive, *see Molski*, 405 F. Supp. 2d at 1167, the Court is more troubled by Mr. Rutherford's unflinching pursuit of what may be a moot controversy. *See* ECF No. 49 at 9–10; *see also* Decl. of Diane Koczur ("Koczur Decl.," ECF No. 49-4) ¶ 4 ("In approximately February 2018 . . . , Evans Hotels updated the websites for all three properties in order to centralize information about room accessibility on one page. These new centralized pages ("Accessibility Pages") include even more information on the accessibility of the properties, and the accessibility features that are built in[]to some rooms or can be added

37

to any room.").  Although Mr. Rutherford testified that "mobility issues are very important to my family" and that "it's a very important issue" because "there are a lot of people that don't have a voice . . . and they can use a voice, and that's me," *see* Tr. at 107:13–22, "[i]f [Mr. Rutherford] were truly interested in achieving access, he should encourage business owners to perform remedial measures," *see Molski*, 405 F. Supp. 2d at 1167, which it appears the instant lawsuit accomplished in February 2018, shortly after it was filed in January of that year.  *See generally* ECF No. 1.  Rather than close the book on a job well done and move on, Mr. Rutherford has required the Parties and this Court to expend valuable resources so that he may "extort [his] cash settlement."  *See Molski*, 405 F. Supp. 2d at 1167.

"*Second*, other factual contradictions in the record further call into question Plaintiff's credibility."  *See Vogel*, 2017 WL 4586348, at *7 (emphasis in original).  For example, Mr. Rutherford testified that the Association has a couple of "active members" in Chicago, *see* Tr. at 49:5–9, although he also testified at the evidentiary hearing that they had not "had any association or activities involved with [the Association]" in the last three years, *see id.* at 50:5–9, and at the Association's October 19, 2018 deposition that he had not spoken with the only two other members he could name for between five and ten years.  *See* Ass'n Depo. at 24:2–27:21.  Mr. Rutherford also testified that he and Ms. Filardi had "actually stay[ed]" at the Pelican Hill Resort, *see* Tr. at 63:17–18, 68:5–6, although Ms. Filardi later clarified that they had not stayed overnight "[b]ecause it was not accessible to [her]."  *See id.* at 130:15–21.  These are but two examples, but the cumulative effect is diminished confidence in Mr. Rutherford's testimony.

But factual contradictions were not the only factor bearing upon Mr. Rutherford's credibility.  Mr. Rutherford appears to tend to exaggerate or understate his testimony to his advantage.  Examples of Mr. Rutherford's tendency to hyperbolize include his testimony that he has had several "surgical procedures" for his spinal stenosis, which it turned out were epidural steroid injections, *see* Tr. at 9:16–12:24, and that, despite being unemployed, *see id.* at 56:1–3, he and Ms. Filardi "could probably [afford to] stay 30, 40, 50, 60 days,

if we wanted to, overnight [at hotels in Southern California per year]." *Id.* at 149:4–10. Naturally, Mr. Rutherford's propensity for exaggeration leads the Court to question whether he similarly has exaggerated the extent of his disability and/or his intent to return to Defendant's Hotels.  Similarly, Mr. Rutherford tends to downplay certain unfavorable facts, testifying at his October 16, 2018 deposition that he believed he had been involved in fewer than 100 ADA lawsuits total, *see* Rutherford Depo. at 43:2–13, whereas he had filed 211 such cases in the Central District alone by then.  *See* Def.'s RJN Ex. J. Mr. Rutherford similarly testified that he did not believe it was possible that he had filed more than twenty lawsuits against hotels, *see* Tr. at 64:15–23, whereas Mr. Rutherford already had filed fifteen such suits against hotels in this District alone by that time.  *See supra* note 10.

Other testimony was simply implausible, such as Mr. Rutherford's claim that he did not know that Defendant's Hotels were related to each other at the time he visited the Websites.  *See* Rutherford Depo. at 168:3–16.  It is hard to believe that Mr. Rutherford just happened upon the Websites for Defendant's three Hotels among the hundreds of websites offering lodging options in the San Diego area.  Further, Mr. Rutherford's self-diagnosed short- and long-term memory loss appears all-too-convenient, *see* Tr. at 59:6–61:9, allowing him not to "remember" certain facts he did not want to appear in the record—such as the house number affiliated with his present address,[11] *see* Rutherford Depo. at 22:10–23:17—while simultaneously testifying that he "ha[d] a better recollection [at the evidentiary hearing], on July 1st, 2019, than [he] did [at his deposition] on October 16th, 2018, about actions [he] took in 2017 [in reviewing Defendant's Websites]."  Tr. at 59:2–5.

Like Defendant, *see* Def.'s Closing Br. at 11–12, the Court was also troubled by the number of leading questions asked by Plaintiffs' counsel.  After over a dozen objections to

---

[11] The Court notes that, by contrast, Mr. Rutherford had no difficulty providing the address for his prior residences in Chicago.  *See* Rutherford Depo. at 26:25:22–26:1, 27:7–18.

leading questions at the evidentiary hearing from Defendant's counsel, the Court admonished Plaintiffs' counsel, "[C]ounsel, we cannot be leading.  You cannot testify, sir." Tr. at 38:3–4.  As Defendant notes, *see* Def.'s Closing Br. at 12, on redirect Plaintiffs' counsel requested leave to ask leading questions:  "Your honor, I believe it would be very helpful if I can ask leading questions in the sense that we're on redirect and these are issues that were explored by [Defendant's] counsel."  Tr. at 106:1–4.  The leading questions concerned such topics as Mr. Rutherford's disability, *see id.* at 12:1–5, 18:5–10, 19:10–13, 20:21–25;  Mr. Rutherford's reasons for visiting the Websites, *see id.* at 29:11–14, 119:17–19;  Mr. Rutherford's evaluation of the Websites and the obstacles he allegedly encountered thereon, *see id.* at 31:21–32:2, 33:12–16, 35:18–21, 36:22–37:17, 40:9–14, 122:19–24; and Mr. Rutherford's motivation for filing other ADA lawsuits, *see id.* at 105:20–25.  Because Mr. Rutherford's counsel "suggested the desired answer" to such inquiries, the credibility of Mr. Rutherford's responses is suspect.  *See, e.g.*, *Molski*, 405 F. Supp. 2d at 1168 ("Throughout the evidentiary hearing . . . , [the plaintiff]'s attorney only asked leading questions that suggested the desired answer and became visibly upset or impatient when [the plaintiff] did not answer his questions with the 'correct' or 'desired' answer.").

Finally, the Court is troubled by the allegations by the Riverside County District Attorney's Office in the Enforcement Action.  The Enforcement Action alleges that Plaintiffs' "federal ADA lawsuits . . . rely on a few core misrepresentations," Bermudez *Ex Parte* Decl. Ex. A.  ¶ 21, including that Mr. "Rutherford had no good faith intention to return to any of the businesses sued in Defendants' federal ADA lawsuits[] and[,] in fact[,] did not return to any of the businesses sued in Defendants' federal ADA lawsuits after filing said lawsuits," *id.* ¶ 25, and, consequently, Mr. "Rutherford lacked standing to file and maintain each and every one of Defendants' federal ADA lawsuits, and Defendants were aware of this lack of standing at the time each and every one of their federal ADA lawsuits were filed and settled."  *Id.* ¶ 26.  The Court recognizes that these are mere allegations, that the demurrer was sustained without leave to amend, and that the

Enforcement Action is presently on appeal.  Nonetheless, the Court properly can take judicial notice that the allegations have been made, even if it cannot accept those allegations for their truth.  The fact that Mr. Rutherford has been accused of falsely alleging an intent to return to the businesses he has sued to establish Article III standing gives the Court pause, particularly given that the record of this case appears to corroborate those allegations.

The sum total is that neither the relevant factors nor Mr. Rutherford's performance at the evidentiary hearing support his genuine intent to return to Defendant's Hotels, and Mr. Rutherford's showing falls short of those found sufficient in the seminal Ninth Circuit opinions in *CREEC*, *D'Lil*, *Doran*, or *Pickern*.  The plaintiffs in *CREEC*, a case on which Mr. Rutherford relied heavily in his Response to the Court's OSC, *see* Pls.' Resp. at 7–8, attested that they were frequent travelers.  *See, e.g.*, ECF No. 62-2 ¶ 5 ("My husband and I like to travel together.  We travel about every four months.  For example, we recently went on a big trip to Rome, Italy.  We also travel to attend conventions for [Little People of America], to visit relatives, for family events, and just for fun.  We're planning to go to an LPA convention in Boston next year and to New York City for my nephew's wedding."); ECF No. 62-3 ¶ 6 ("I travel frequently for my work, for the Legal Services Corporation, and for pleasure.  In the last ten years, I have made approximately three trips to the San Francisco Bay Area and have stayed at a hotel on each of those occasions.  My brother, sister-in-law and their kids live in the San Francisco Bay Area, and I visited them during my last trip.  I will return to the San Francisco Bay Area again in the future to visit them."); ECF No. 62-4 ¶ 5 ("I am a frequent traveler and often stay in hotels.  I travel for work, as part of my political involvement, and to visit friends and family.").  Mr. Rutherford, by contrast, rarely spends the night in hotels, particularly those in San Diego.  *See* Tr. at 62:1–63:7, 83:22–84:1; Rutherford Depo. at 70:2–71:7.

In *D'Lil*, the plaintiff testified that she had been visiting the city in which the defendant hotel was located "since the early 1980s for both business and pleasure," visiting approximately one to three times per year for work between 1993 and 2000.  *See* 538 F.3d

at 1037.  In 2001, the year she stayed at the defendant's hotel, she had made three trips to the area to visit friends, vacation with her children, and for work.  *See id.*  In the following three years, she had returned four times for business and to visit friends.  *See id.* at 1037–38.  She also had three upcoming trips to the area planned as of the evidentiary hearing.  *See id.* at 1038.  She expressed a particular fondness for "the region's beauty, the weather; the history of the region; [her] friends . . . who live there; [her] past frequent visits with [her] children . . . ; the many major attractions there, especially the Mission and the beach; the downtown shopping and the local cuisine, which is unique and outstanding." *Id.* at 1037 n.5.  Additionally, she explained that she had a particular preference for staying at the defendant hotel because of its "proximity to downtown, its accessibility from the freeway, . . . its amenities," restaurant, and price, *see id.* at 1038, and provided an explanation for why she preferred that hotel over other accessible hotels in the area.  *See id.* at 1038 n.7.  Similarly, the plaintiff in *Doran* "had visited the [defendant] store on ten to twenty prior occasions, . . . [which] is conveniently located near his favorite fast food restaurant in [the area], . . . he plan[ned] to visit . . . at least once a year on his annual trips." 524 F.3d at 1040.  And the plaintiff in *Pickern* attested that his "favorite grocery store chain is the [defendant's] grocery stores" and that he frequently was in the area of the particular store sued—approximately weekly—because his grandmother lived there.  *See* 293 F.3d at 1135.  Unlike the plaintiffs in *D'Lil*, *Doran*, and *Pickern*, Mr. Rutherford could not recall ever having visited San Diego before, *see* Tr. at 62:1–63:7; *see also* Rutherford Depo. at 52:20–53:17, and could articulate only general desires to visit San Diego and to stay in Defendant's Hotels.  *See* Tr. at 61:23–24, 148:2–20.

Mr. Rutherford's testimony instead is more reminiscent of that offered at the evidentiary hearings in *Molski* and *Gastelum*, in which the district courts concluded that the plaintiffs had failed to establish standing to seek injunctive relief.  In *Molski*, for example, the plaintiff sued a winery whose tasing room he had visited.  *See* 405 F. Supp. 2d at 1162.  The tasting room was located 104 miles from the plaintiff's residence, the plaintiff had not visited the tasting room before or after the visit giving rise to his lawsuit,

the plaintiff "ha[d] not stated a particular preference for the wines from [the winery]," the plaintiff had sued over 500 businesses located throughout California in the previous four years, the plaintiff "only ha[d] stated a general intent to return sometime in the future," and the plaintiff had an "attenuated" connection to the area in which the winery was located. *See generally id.* at 1163–68.  The court also noted that, "[t]hroughout the evidentiary hearing [the plaintiff]'s testimony was evasive, dishonest, deceptive, and contrived" and "[the plaintiff]'s attorney only asked leading questions that suggested the desired answer." *See id.* at 1168–69.  The court therefore concluded that "there [we]re no objective facts that would support[ the plaintiff]'s standing to seek injunctive relief."  *See id.* at 1168.

Similarly, the plaintiff in *Gastelum* had sued over 130 hotels in the metropolitan area that was located approximately fifty-five miles from his residence, an area to which he frequently traveled to "attend sporting events, karaoke bars, and go shopping."  2018 WL 2388047, at *3, 7–8.  Although the plaintiff had stayed overnight at hotels in that area ten times in the prior year, never staying at any single hotel more than once, the overnight stays did not correlate with sporting events and the plaintiff offered no testimony that the stays coincided with karaoke or shopping trips.  *See id.* at *3.  Based on his household income, the plaintiff estimated that he could afford to stay at such hotels a maximum of twelve to fifteen times per year.  *Id.* at *4.  The plaintiff also could not recall at the evidentiary hearing why he had been interested in staying in particular hotels.  *See id.* at *8.  The court concluded that, "[b]ecause of the volume of cases he has brought[;] his limited reasons for staying in [the metropolitan area;] the proximity to [the plaintiff's residence] to which he easily can, and frequently does, return for his overnight stays[;] the evident enterprise in conjunction with his attorney to sue many hotels in the [metropolitan] area for ADA compliance[;] his personal finances[;] his past travel habits[;] and his testimony that he could not return to all hotels he has sued, the Court finds that he has failed to establish a sufficient likelihood that he would return to any of the hotels that are the defendants in the cases in which this hearing is noticed."  *Id.* at *4.  If anything, the plaintiff in *Gastelum* / / /

43

made a stronger showing than Mr. Rutherford in that the plaintiff in *Gastelum* regularly traveled to and had stayed in ten hotels in the area in which he had filed his lawsuits.

Based on a thorough review of the record, the Court concludes that Mr. Rutherford has failed to establish an intent to return to Defendant's Hotels. Accordingly, the Court concludes that Mr. Rutherford lacks Article III standing to pursue his claims for injunctive relief under an injury-in-fact and intent to return theory.

### 2. Deterrence

Alternatively, Mr. Rutherford may establish standing under the "deterrent effect doctrine," *see CREEC*, 867 F.3d at 1098 (citing *Chapman*, 631 F.3d at 949–50), which provides that "[w]hen a plaintiff who is disabled within the meaning of the ADA has actual knowledge of illegal barriers at a public accommodation to which he or she desires access, that plaintiff need not engage in the 'futile gesture' of attempting to gain access in order to show actual injury." *Id.* at 1098–99 (quoting *Pickern*, 293 F.3d at 1135 (quoting 42 U.S.C. § 12188(a)(1)). "So long as the discriminatory conditions continue, and so long as a plaintiff is aware of them and remains deterred, the injury under the ADA continues." *Id.* at 1099 (quoting *Pickern*, 293 F.3d at 1137). Further, "[i]t is the plaintiff's 'actual knowledge' of a barrier, rather than the source of that knowledge, that is determinative." *Id.* (quoting *Pickern*, 293 F.3d at 1135).

Plaintiffs contend that Mr. Rutherford "was deterred from making a reservation" through Defendant's Websites because he "encountered barriers to access presented by the Evans reservations system through a lack of information about accessibility and due to the extra steps required to reserve a room." Pls.' Resp. at 2; *see also* Pls.' Closing Br. at 3 (citing Tr. at 30:1–17, 41:24–42:18, 106:20–107:9, 148:2–20), 7.

Defendant counters with several arguments. First, Defendant argues that Mr. Rutherford was not deterred from accessing the Websites because "Plaintiffs have not presented any evidence demonstrating their use or enjoyment of the Evans Hotels' websites was . . . impeded in any way[ or] . . . that access to the website was minimized as a result of their mobility impairments." Def.'s Closing Br. at 3 (citing Tr. at 8:15–21, 19:1,

29:16–25, 30:12–18, 30:24–31:2, 33:3–4, 33:18–25, 34:20–35:5, 46:8–24, 58:10–21, 121:16–122:18).  To the extent Plaintiffs contend that Mr. Rutherford was deterred from accessing Defendant's Websites or reservations system(s), the Court must agree with Defendant that Mr. Rutherford has failed to introduce any evidence that any of his impairments impeded his access to the Websites or their reservations services.

Second, Defendant contends that Mr. Rutherford never attempted to use any of Defendants' reservation services to which Section 36.302(e)(1)(i) applies, meaning that he "do[es] not have personal knowledge of what information was available through the on line booking engine, the live-chat feature of the website, or the phone based reservations service."  Def.'s Closing Br. at 4 (citing Tr. at 36:14–18).  Plaintiffs rejoin that "Defendant does not explain why its Websites – a means that is definitively used to describe its hotels and rooms, and book rooms at Defendant's hotel – are excluded as a reservation system" under Section 36.302(e)(1). Pls.' Closing Br. at 1.  There is a dearth of authority addressing this issue, but the Court concludes it need not resolve it because Mr. Rutherford has failed to establish deterrence whether Section 306.302(e)(1)(ii) applies only to the booking pages or to Defendant's Websites as a whole.

Third and finally, Defendant urges that "deterrence from booking based on inadequate content is not within the 'deterrent effect doctrine,'" Def.'s Closing Br. at 5, because "Plaintiffs had no actual knowledge of any illegal barriers at the Evans Hotels' properties which deterred them from booking at the time they chose not to book."  *Id.* at 6.  Further, Plaintiff did not "attempt to access the hotel reservation systems to see if additional information may be located there."  *Id.* at 7.  Plaintiffs rejoin that Mr. Rutherford did access Defendant's online reservation system and was deterred when he "tried to learn about and reserve rooms using Defendant's exclusive online reservation system – its Websites – and w[as] denied full and equal access, in violation of section 36.302(e)(1)" and that, "[b]y the nature of being denied access from Defendant's hotel reservation system because [of] its discriminatory policies and procedures, Plaintiffs were also denied access to Defendant's

/ / /

45

physical hotels." *Id.* at 3 (citing *Chapman*, 631 F.3d at 947; *ADA Title III Regs.*, Sept. 15, 2010, at p. 980).

As discussed above, *see supra* Section II.A.1.a, the Court concludes that Mr. Rutherford has failed to establish actual knowledge of any alleged barrier sufficient to establish standing under the deterrent effect doctrine. Mr. Rutherford testified that he did not "actually seek to consummate a reservation" because "[t]here would be no point in that" given that he "didn't know anything about the accessibility of the room or the hotel." Tr. at 36:14–21; *see also id.* at 42:14–18, 43:3–5. He also has not "attempted to reserve a room at any Evans hotel" since then. *Id.* at 41:21–23. At his deposition, he could not recollect having visited the booking page on any of the Websites. *See* Rutherford Depo. at 161:5–164:9. Accordingly, Mr. Rutherford has failed to adduce any evidence that he has actual knowledge that he neither "c[ould] make reservations for accessible guest rooms during the same hours and in the same manner as individuals who do not need accessible rooms" through the Websites nor that Defendant failed to "[i]dentify and describe accessible features in the hotels and guest rooms offered through its reservations service in enough detail to reasonable permit individuals with disabilities to assess independently whether a given hotel or guest room meets his or her accessibility needs." *See* 28 C.F.R. §§ 36.302(e)(1)(i)–(ii). Rather, Mr. Rutherford's alleged deterrence is based on his own suppositions concerning the deficiencies of a reservation that he never reviewed in making a determination as to whether to book a room at Defendant's Hotels. This does not amount to "actual knowledge" of deficiencies in Defendant's reservation system or its description of accessibility features through its reservation service.

As part of the deterrent effect doctrine, Plaintiffs also must establish that Mr. Rutherford intends to stay at Defendant's Hotels if the alleged deficiencies are remedied. *See, e.g.*, *CREEC*, 867 F.3d at 1099; *Johnson v. DTBA, LLC*, 424 F. Supp. 3d 657, 665–66 (N.D. Cal. 2019) (dismissing ADA complaint for lack of subject-matter jurisdiction where the court concluded that the plaintiff "ha[d] not adequately alleged that he is likely to return to the [public accommodation] or that [he wa]s deterred from doing

46

so" where the plaintiff did "not allege: (1) that he prefers this [accommodation] over others, (2) any specific instances of deterrence,  or (3) that he often patronizes [accommodations in that locality] and would patronize this one but-for the violations") (citing *Doran*, 524 F.3d at 1040; *Pickern*, 293 F.3d at 1138; *Parr*, 96 F. Supp. 2d at 1079–80); *Barnes*, 2017 WL 635474, at *8 (concluding that standing based on deterrence requires "evidence of more than the 'some day' intentions . . . at an uncertain point in the future") (collecting cases).  For the reasons discussed above, *see supra* Section II.A.1.b, the Court concludes that Mr. Rutherford has failed to make the requisite showing.  Accordingly, the Court concludes that Mr. Rutherford has failed to establish Article III standing under the deterrent effect doctrine.

### B.    The Association's Standing

An association may have standing either "in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy," *Warth v. Seldin*, 422 U.S. 490, 511 (1975), or, "[e]ven in the absence of injury to itself, . . . as the representative of its members."  *Id.* (citing *Nat'l Motor Freight Ass'n v. United States*, 372 U.S. 246 (1963)).  In the latter case, "[t]he association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Id.* (citing Sierra Club v. Morton, 405 U.S. 727, 734–41 (1972)). Because "[a]ssociational standing is reserved for organizations that 'express the[ ] collective views and protect the [ ] collective interests' of their members," *Cal. Cmties. Against Toxics v. Armorcast Prod. Co.*, No. CV 14-5728 PA FFMX, 2015 WL 519083, at *3 (C.D. Cal. Feb. 9, 2015) (quoting *Fleck & Assocs., Inc. v. Phoenix*, 471 F.3d 1100, 1106 (9th Cir. 2006) (quoting *Hunt*, 432 U.S. at 345)) (alterations in original), "the association's members must possess sufficient 'indicia of membership—enough to satisfy the purposes that undergird the concept of associational standing: that the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to have a 'personal stake in the outcome of the controversy.'" *Id.* (quoting *Or. Advocacy Ctr. v.*

*Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003) (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 261 (1977))).

Here, Plaintiffs contend only that the Association has "standing to bring suit on behalf of its members," not that the Association has standing in its own right. *See* Pl.'s Supp. Br. at 19–21. Accordingly, Plaintiffs must show that "(a) [the Association's] members would otherwise have standing to sue in their own right; [and] (b) the interests [the Association] seeks to protect are germane to the organization's purpose." *Id.* at 19 (quoting *Hunt*, 432 U.S. 343).

Plaintiffs contend that they have met their burden because "[t]he record shows that both Plaintiff Rutherford and Claimant Filardi are members . . . and [the Association] has other members." *Id.* at 20 (citing Tr. at 49:5–9, 49:22–25). Further, "Plaintiff Rutherford has shown that he has standing in his own right," *id.*, and Ms. "Filardi . . . also has standing to bring the same ADA claim had she chosen to be a plaintiff." *Id.* (citing Tr. at 119:21–120:9, 121:1–12, 121:23–128:1, 139:3–140:17). As for the second requirement, "the interests of ADA compliance that [the Association] seeks to protect through this lawsuit are germane to its purpose to educate and further disability rights." *Id.* at 21.

Defendant responds that the Association "is completely devoid of credibility[] and is merely a tool of deception designed to extract higher statutory settlements from California businesses." Def.'s Closing Br. at 10. Defendant adds that, in addition to Mr. Rutherford, "[t]he only other currently active member of [the Association] is [Ms.] Filardi," *id.* (citing Tr. at 49:5–50:9; Ass'n Depo. at 27:8–21, 51:15–21), and that Mr. "Rutherford's testimony on interests or contacts with alleged members is devoid of credibility." *Id.* (citing Ass'n Depo. at 10:7–10, 26:23–27:21, 30:9–11, 96:19–21, 100:24–101:9). In short, "the Association is a sham organization and an alter ego of James Rutherford" that "should not be afforded associational standing in this matter." *Id.* at 11. Further, "[e]ven if [the Association] was a legitimate organization—and it is not—there is no evidence or legal theory to support a finding that [the Association] could have standing independent from Mr. Rutherford." *Id.* (citing Tr. at 156:25–157:3).

The Court agrees with Defendant.  Plaintiffs have failed to establish that Mr. Rutherford has standing, *see supra* Section II.A, and the Court concludes that Ms. Filardi, although more credible than Mr. Rutherford, has failed to establish standing for similar reasons.  Ms. Filardi's testimony established that the relevant factors equally weigh against her professed intent to return to Defendant's Hotels.  *See supra* pages 33–35.  Accordingly, Plaintiffs have failed to establish that the Association's "members would otherwise have standing to sue in their own right." *Hunt*, 432 U.S. 343.

Even if Mr. Rutherford or Mr. Filardi had established standing to sue in their own right, however, the Court concludes that the Association has failed to meet "[t]he threshold requirement . . . that [it] has actual members or indicia of membership," *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, No. SACV07250DOCANX, 2008 WL 11411732, at *3 (C.D. Cal. Aug. 18, 2008) ("*ATLF*") (quoting *Am. Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 51 n.12 (D.C. Cir. 1998) (citing *Hunt*, 432 U.S. at 342–43)) (first alteration in original), *aff'd*, 624 F.3d 1083 (9th Cir. 2010), for at least the following reasons.  First, Mr. Rutherford's testimony that the Association has members in addition to himself and Ms. Filardi is not credible—the only other "members" Mr. Rutherford could name had not had any involvement with the Association for several years prior to the evidentiary hearing.  *See, e.g.*, Tr. at 50:5–9; Ass'n Depo. at 24:2–27:21. Second, the Court is skeptical of the Association's "very informal education program," *see* Tr. at 50:15–18, of which Mr. Rutherford keeps no records, *id.* at 51:6–7, and which Mr. Rutherford had not engaged in "recently" as of his testimony on July 1, 2019.  *See id.* at 51:8–10.  Third, there are few—if any—indicia that the Association is a legitimate membership organization:  it has no regularly scheduled meetings, *see* Ass'n Depo. at 29:23–25; no board of governance, Tr. at 49:2–4; Ass'n Depo. at 30:3–11; no policies or procedures, *see* Ass'n Depo. at 77:19–23; and no bylaws.  *See id.* at 77:24–78:4; *see also Hunt*, 432 U.S. at 344–45 (listing factors evidencing indicia of membership); *ALTF*, 2008 WL 11411732, at *4 (concluding that "amorphous" and loosely structured organization representing day laborers could establish standing where there was "evidence regarding

. . . specific participation of [the plaintiff association's] members in [its] activities and governance," such as "members attend meetings, participate in [the plaintiff association's] activities . . . , make a commitment to maintain order amongst themselves, and assist in the prosecution of this litigation" and "decisions of [the plaintiff association] are made by its members through their oral vote or consensus"). Fourth, Mr. Rutherford makes little to no effort to separate the Association's and his own ADA-related settlements, commingling settlement funds in a single checking account, *see id.* at 33:14–35:22; Tr. at 55:12–25, and withdrawing—at times significant amounts of—those funds for his own personal expenses. *See* Tr. at 53:12–13; Rutherford Depo. at 184:20–185:7, 190:12–18.

On this record, the Court concludes that the Association is not a legitimate organization, but rather serves as the alter ego of Mr. Rutherford and/or Ms. Filardi. As such, it does not "''express the[ ] collective views and protect the[ ] collective interests' of [its] members," *Fleck & Assocs.*, 471 F.3d at 1106 (quoting *Hunt*, 432 U.S. at 345) (first and second alterations in original), but instead furthers only the interests of Mr. Rutherford and/or Ms. Filardi. Consequently, the Association is not entitled to associational standing.

## C. Supplemental Jurisdiction

Although Defendant requests that the Court exercise supplemental jurisdiction over Plaintiffs' remaining Unruh Act claims,[12] *see* Def.'s Resp. at 8–10, the Court declines in its discretion to do so. *See, e.g.*, *Barnes*, 2017 WL 635474, at *13 (declining to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c) over remaining state law claim after dismissing ADA claim for lack of standing); *see also* Def.'s Resp. at 8 ("The decision whether to continue to exercise supplemental discretion over state law claims after all

---

[12] The Court sympathizes with Defendant's position that "[t]o remand Plaintiff's Unruh Act claims would be inefficient, inconvenient, unfair, and unjust to Defendant, the judicial system, and the public at large, which has an interest in putting an end to ADA lawsuit abuse." Def.'s Resp. at 10. Ultimately, however, "as a matter of comity, and in deference to California's substantial interest in discouraging unverified disability discrimination claims," *see Schutza v. Cuddeback*, 262 F. Supp. 3d 1025, 1031 (S.D. Cal. 2017), the Court concludes that the totality of the circumstances warrants remand of Mr. Rutherford's remaining state law claims.

18-CV-435 JLS (MSB)

federal claims have been dismissed lies within the district court's discretion.") (quoting *Foster v. Wilson*, 504 F.3d 1046, 1051 (9th Cir. 2007)).  "Because the California courts should be given an opportunity to interpret California's disability laws, because the calculated effort to avoid having California courts decide issues of California law is to be discouraged, and because the parties themselves are entitled to a surer-footed interpretation of California's disability laws, the Court finds that compelling reasons exist to decline supplemental jurisdiction over [Mr. Rutherford]'s state law claims."  *See Molski v. Hitching Post I Rest., Inc.*, No. CV 04-1077SVWRNBX, 2005 WL 3952248, at *9 (C.D. Cal. May 25, 2005).

## CONCLUSION

The ADA—which has recently celebrated its thirtieth anniversary—is an important piece of litigation "intended to achieve the prompt remediation of architectural and other barriers that impede access to places of public accommodation by the disabled community."  *See Molski*, 405 F. Supp. 2d at 1167.  But the Court lacks jurisdiction to adjudicate those rights where the plaintiff lacks standing to assert her claims.  *See Chapman*, 631 F.3d at 954.  "[P]articularly in view of a recognized trend of abusive ADA litigation . . . , special diligence and vigilant examination of the standing requirement are necessary and appropriate to ensure the litigation serves the purposes for which the ADA was enacted."  *See Harris*, 472 F. Supp. 2d at 1215.

On a thorough review of the record in this case, the Court determines that Plaintiffs have failed to carry their burden of establishing Article III standing.  Accordingly, the Court (1) **DISMISSES** Plaintiffs' second cause of action for violation of the ADA for lack of subject-matter jurisdiction; (2) **DECLINES** to exercise supplemental jurisdiction over Plaintiff's first cause of action for violation of the Unruh Act; (3) **DENIES AS MOOT** the Pending Motions (ECF Nos. 45, 60, 73); and (4) **REMANDS** this action to the Superior

/ / /

/ / /

/ / /

51

Court of the State of California, County of San Diego.  Because this action concludes the litigation in this matter, the Clerk of Court **SHALL CLOSE** the file.

   **IT IS SO ORDERED.**

Dated:  September 3, 2020

              Hon. Janis L. Sammartino
              United States District Judge

18-CV-435 JLS (MSB)